**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MANUEL KEVORK TERENKIAN;
PENTONVILLE DEVELOPERS, LTD.;
MARBLEARCH TRADING, LTD.,
            *Plaintiffs-Appellees,*

v.

THE REPUBLIC OF IRAQ; THE
REPUBLIC OF IRAQ, by and through
State Oil Marketing Organization,
            *Defendants-Appellants.*

No. 10-56708

D.C. No.
2:03-cv-05485-
CBM-SH

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted
December 6, 2011—Pasadena, California

Filed September 18, 2012

Before: John T. Noonan, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Noonan

11373

## COUNSEL

Edward L. Powers (argued), Zukerman Gore Brandeis & Crossman, LLP, New York, New York; Susan L. Hoffman, Robert A. Brundage, Bingham McCutchen, LLP, Los Angeles, California, for appellant Republic of Iraq.

Melinda W. Ebelhar (argued), Edward D. Vaisbort, G. David Rubin, Litchfield Cavo LLP, Pasadena, California; Alan Gura, Gura & Possessky, PLLC, Alexandria, Virginia, for appellees Pentonville Developers, Ltd. and Marblearch Trading, Ltd.

## ORDER

The opinion filed on July 16, 2012, and appearing at 686 F.3d 1061 is withdrawn. The superseding opinion will be filed concurrently with this order. The parties may file an additional petition for rehearing or rehearing en banc. All other pending motions are denied as moot.

## OPINION

IKUTA, Circuit Judge:

Pentonville Developers, Ltd., and Marblearch Trading, Ltd., two Cyprus oil brokerage companies, sued the Republic

of Iraq for unilaterally terminating two contracts for the purchase and sale of Iraqi oil. The district court held it had subject matter jurisdiction to hear this action notwithstanding Iraq's assertion of sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 et seq., because the lawsuit fell within the "commercial exception" to that immunity. Because the lawsuit is not based upon commercial activity by Iraq in the United States nor upon an act in connection with such commercial activity having a direct effect in the United States, *see* 28 U.S.C. § 1605(a)(2), we hold that the district court erred in denying Iraq's motion to dismiss for lack of subject matter jurisdiction.

I

Pentonville Developers, Ltd., and Marblearch Trading, Ltd., are oil brokerage companies that are headquartered in and formed under the laws of Cyprus. Manuel Terenkian is the president and sole shareholder of both companies. Beginning in 2000, Pentonville and Marblearch commenced negotiations with Iraq under the auspices of the United Nations Oil for Food Program to enter into transactions for the purchase and sale of Iraqi oil.[1]

---

[1]The Oil for Food Program was a by-product of the United Nations Security Council's imposition of an international trade embargo on Iraq as a sanction for its invasion of Kuwait. The trade embargo had a damaging effect on Iraq's population. To ameliorate the worsening humanitarian situation resulting from this embargo, the United Nations Security Council subsequently passed a resolution establishing an Oil for Food Program administered by a United Nations committee. This program authorized Iraq to sell oil and petroleum products to third parties, notwithstanding the embargo, so long as all revenues from these sales were deposited in a United Nations escrow account maintained by Banque Nationale de Paris, S.A., in New York. The funds could then be used to purchase goods that were necessary for the humanitarian needs of the Iraqi people. To ensure that the oil revenues would be used only for such humanitarian purposes, all transactions under the Oil for Food Program required the United Nations committee's oversight and approval. *See* S.C. Res. 986, U.N. Doc. S/RES/986 (Apr. 14, 1995).

In November 2000, pursuant to the Oil for Food Program requirements, Pentonville entered into a contract to purchase oil from the State Oil Marketing Organization (SOMO), a company formed under the laws of and wholly owned by the Republic of Iraq. A few months later, Marblearch also entered a contract to purchase oil from SOMO. As specified in the contracts, Pentonville agreed to purchase one million barrels of Kirkuk crude oil for the "Europe" market and two million barrels of Basrah light crude oil for the "USA/Far East" market. Marblearch agreed to purchase two million barrels of Kirkuk crude oil for "Europe and/or U.S.A." The contracts were to be performed in Iraq or Turkey, where title to the crude oil would pass to the purchaser. Pentonville and Marblearch agreed that payment for each cargo of crude oil would be made from the proceeds of an irrevocable documentary letter of credit directly into a United Nations escrow account. The contracts additionally specified that Pentonville and Marblearch would process the oil in their own refineries; the companies could use the refineries of third parties only with SOMO's prior approval. Moreover, any breach of this obligation would constitute a default for which SOMO could terminate the contracts. Finally, the contracts provided for arbitration in accordance with the rules of the International Chamber of Commerce to settle any disputes arising from the contracts, and designated the place of arbitration as Baghdad "or any other place mutually agreed upon." These contracts were duly approved by the United Nations committee supervising the Oil for Food Program.

In July 2003, Pentonville, Marblearch, and Terenkian (collectively referred to here as the plaintiffs) filed a complaint against the Republic of Iraq by and through SOMO. As amended in May 2007, the complaint alleged that after the Pentonville contract had been executed at the Permanent Mission of Cyprus to the United Nations in New York, Iraqi officials demanded that Pentonville pay SOMO additional fees that were not required by the contract. When Pentonville refused to make these payments, SOMO unilaterally canceled

the contract. After Marblearch subsequently entered into a substantially similar contract, also executed at the Cyprus Mission in New York, the same scenario played out: Iraqi officials demanded additional payments, which Marblearch refused, and SOMO again canceled the contract.[2]

Based on these allegations, the plaintiffs filed a complaint claiming that Iraq and SOMO breached their contracts with Pentonville and Marblearch, causing Pentonville to lose no less than $3,750,000 in brokerage fees and Marblearch to lose no less than $2.5 million in brokerage fees.

The complaint also sets forth the alleged basis of the district court's subject matter jurisdiction over the Republic of Iraq, which plaintiffs alleged was the actual defendant in the suit. The "sole basis" for United States federal courts to obtain jurisdiction over a foreign state is the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The FSIA "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 610 (1992). Under § 1604 of the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided" in various exceptions.

Because the plaintiffs aimed their action at Iraq, they had the preliminary burden of establishing that Iraq was not entitled to immunity. *See Meadows v. Dominican Republic*, 817 F.2d 517, 522 (9th Cir. 1987). In an effort to do so, the complaint alleged that the "commercial exception" to sovereign

---

[2]The complaint further alleges that, in retaliation for this refusal to pay additional fees, Iraq instituted charges of criminal fraud against Terenkian, who in September 2002, was taken captive in Syria and imprisoned pending extradition to Iraq. Terenkian was released on $30,000 bail after 93 days of imprisonment, whereupon he escaped Syria, thus forfeiting the bail money. Terenkian's wrongful imprisonment claim based on these allegations is not before us.

immunity, set forth in § 1605(a)(2), was applicable. Section 1605(a)(2) provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> . . . .
>
> (2) in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

Courts have construed this commercial activity provision to have three independent clauses, and have used different criteria for each of the three separate clauses to assess a claimed exception. *See, e.g.*, *Am. W. Airlines, Inc. v. GPA Grp.*, 877 F.2d 793, 796-97 (9th Cir. 1989) (applying a "nexus" requirement to the first clause); *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 709 (9th Cir. 1992) (applying a "material connection" requirement to the second clause); *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726-27 & n.4 (9th Cir. 1997) (applying a "legally significant acts" test to the third clause). Citing only the third clause, the complaint alleged that the plaintiffs may seek monetary damages from Iraq because it conducted "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States." § 1605(a)(2). In their subsequent motion for a default judgment, the plaintiffs argued that the district court had jurisdiction "because the contracts in this action contemplated the purchase of oil, some of which was intended

for distribution in the United States," meaning that "Iraq's unilateral cancellation of the contracts resulted in a 'direct effect' in the United States."

After various delays,[3] Iraq brought a motion to dismiss for lack of subject matter jurisdiction on the ground that the "commercial activity" exception to sovereign immunity under the third clause of § 1605(a)(2) was not applicable. Iraq based this assertion on two arguments: first, that Iraq was not a party to the Pentonville and Marblearch contracts, and second, that the alleged breaches of contract did not have a "direct effect" in the United States because SOMO's place of performance under the contract was Iraq (where the oil would be delivered to the plaintiffs' ship). Furthermore, Iraq argued, there was no contractual requirement or evidence that any of the oil would be sold to customers in the United States, and indeed, Terenkian himself had acknowledged that the oil was to be delivered to an Italian refinery. In support of this motion to dismiss, Iraq submitted copies of the contracts, as well as declarations and other documentary evidence. Iraq further argued that the breach of contract actions should be dismissed because neither Pentonville nor Marblearch had arbitrated the claim as required by the contracts at issue.

In their opposition to the motion to dismiss, the plaintiffs raised two new bases for abrogating Iraq's sovereign immunity. Relying for the first time on the first clause of § 1605(a)(2), the plaintiffs argued that because both contracts at issue were executed in New York, their claims arose out of a commercial activity undertaken by the foreign state which was carried on in the United States. They also argued, again

---

[3]The docket reflects several lengthy delays caused by Iraq's failure to respond to the complaint, resulting in the district court's entry of two default judgments against Iraq. On Iraq's subsequent motions, the district court vacated the entries of default. Although the plaintiffs argued before the district court that Iraq had not met its burden of establishing that it was entitled to relief from default, the parties have not raised this issue on appeal.

for the first time, that because payment was to be made into the United Nations escrow account at the Banque Nationale de Paris, Iraq's alleged breach of the contracts had the "direct effect" that payments were not deposited in a New York bank. With respect to Iraq's assertion of entitlement to arbitration, the plaintiffs argued that arbitration in Baghdad would be impossible and/or commercially impracticable because Terenkian was facing death threats in Iraq. They further argued that, because Iraq is not a signatory to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, the district court could not compel arbitration in Iraq.

The district court denied Iraq's motion to dismiss. After concluding that Iraq was a proper defendant (an issue not on appeal), the district court ruled that Iraq was not entitled to sovereign immunity because the "commercial activity" exception applied: namely, the lawsuit was based on "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." § 1605(a)(2). The district court held that because the contracts required that payment be made in New York, the breach of those contracts constituted a commercial activity that had a direct effect in the United States. Concluding it had subject matter jurisdiction on this basis, the district court did not reach the plaintiffs' alternate arguments based on execution of the contracts or the eventual delivery of some of the oil to the United States. The district court also denied Iraq's motion to dismiss for failure to arbitrate on the ground that the parties had not established that the claims were subject to arbitration at all.

Finally, the district court held that venue in the Central District of California was not proper and transferred venue to the District of Columbia. *See* 28 U.S.C. § 1391(f) (providing for venue in the District of Columbia for a civil action against a foreign state when there is no judicial district in which a substantial part of the events giving rise to the claim occurred).

On appeal, Iraq argues that the district court lacked subject matter jurisdiction, or alternatively, that the case should have been dismissed for failure to arbitrate. Plaintiffs oppose Iraq's arguments on the merits, and they further argue that the appeal is time-barred because the notice of appeal was not filed until after the case was docketed in the District Court for the District of Columbia.

## II

We begin by addressing the parties' jurisdictional arguments.

## A

We first turn to plaintiffs' argument that we lack appellate jurisdiction because Iraq's appeal is time-barred. On April 13, 2010, court clerks entered the district court's order denying Iraq's motion to dismiss the case and transferring it to the District Court for the District of Columbia. That district court docketed the case on April 21, 2010. "[T]his court has adopted the docketing date in the transferee court as the time of effective transfer." *Wilson v. City of San Jose*, 111 F.3d 688, 692 (9th Cir. 1997) (citing *Lou v. Belzberg*, 834 F.2d 730, 733 (9th Cir. 1987)). According to plaintiffs, "[o]nce the transferee court receives and dockets the case files, the transferor court generally loses jurisdiction over the case, as does the transferor court's appellate court." *In re Donald*, 328 B.R. 192, 197 (B.A.P. 9th Cir. 2005) (citations omitted). As noted above, this case was docketed in the District Court for the District of Columbia on April 21, 2010. Therefore, according to plaintiffs, when Iraq filed its notice of appeal in the Court of Appeals for the D.C. Circuit, we had already lost jurisdiction, and the D.C. Circuit's transfer of the case to us was time-barred, and thus ineffective. According to plaintiffs, when Iraq failed to file a notice of appeal before April 21, 2010 (eight days after entry of the district court's order deny-

ing Iraq's motion to dismiss), no appellate court had jurisdiction to hear Iraq's appeal.

**[1]** We disagree. A district court's transfer of a case to an out-of-circuit district court does not strip an appellate court of jurisdiction over an interlocutory but "immediately appealable, and timely appealed, decision" of a district court within its circuit. *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 209 (4th Cir. 2011); *see also Jones v. InfoCure Corp.*, 310 F.3d 529, 534 (7th Cir. 2002). Under 28 U.S.C. § 1294, we have exclusive jurisdiction over such immediately appealable orders. *See* 28 U.S.C. § 1294 (2006) (providing that "appeals from reviewable decisions of the district and territorial courts shall be taken to the courts of appeals as follows: (1) From a district court of the United States to the court of appeals for the circuit embracing the district"). Accordingly, a district court's transfer order does not transfer the immediately appealable order, but only the balance of the case. *See TechnoSteel, L.L.C. v. Beers Constr. Co*, 271 F.3d 151, 160-61 (4th Cir. 2001).[4]

**[2]** Indeed, as our sister circuits have recognized, interpreting a district court's transfer order as transferring an immediately appealable decision would make little sense: because the aggrieved party could not pursue an appeal in the transferee circuit, *see* § 1294, it would have to choose between racing to

---

[4]We have not previously considered our jurisdiction over an immediately appealable order after the balance of a case has been transferred to and docketed in an out-of-circuit district court. *Cf. Lou*, 834 F.2d at 733 (holding that we had appellate jurisdiction over a case that had been transferred to an out-of-circuit district court because the appellant filed her notice of appeal before the transferred records were docketed in that court); *NBS Imaging Sys., Inc. v. U.S. Dist. Ct. for E. Dist. of Cal.*, 841 F.2d 297, 298 (9th Cir. 1988) (holding that we may review an order transferring a case to an out-of-circuit district court by way of mandamus, even after the case is docketed in the transferee court); *Wilson*, 111 F.3d at 692 (holding that "during the time between entry of the transfer order and the receipt of the case file in the transferee court, the *transferor* court remains the forum in which pleadings may be filed.").

file a notice of appeal in our court before the records were docketed in the transferee court, or seeking retransfer from the transferee court to our court before the thirty-day time for appeal expired. *See TechnoSteel*, 271 F.3d at 160-61. Were either option to fail, the transferor court's immediately appealable orders might be forever insulated from appellate review. This would render meaningless the thirty-day time for appeal and frustrate Congress's scheme for appellate review. Therefore, we join our sister circuits in concluding that we retain jurisdiction over immediately appealable orders, even if the balance of the case is transferred to another district. *See Wye Oak Tech.*, 666 F.3d at 209; *InfoCure Corp.*, 310 F.3d at 534.

**[3]** Here, the District Court for the Central District of California denied Iraq's motion to dismiss in an ordered entered April 13, 2010. This order was immediately appealable, as "we have long held that an order denying immunity under the FSIA is appealable under the collateral order doctrine." *Gupta v. Thai Airways Int'l, Ltd.,* 487 F.3d 759, 763 (9th Cir. 2007) (quoting *Compania Mexicana De Aviacion, S.A. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 859 F.2d 1354, 1358 (9th Cir. 1988)) (internal quotation marks omitted). We thus had jurisdiction over this appeal under 28 U.S.C. § 1294. Although Iraq erroneously filed the appeal in the D.C. Circuit, its appeal was timely filed on May 13, 2010, *see* 28 U.S.C. § 2107 (2006) (requiring an appeal to be taken in 30 days). The D.C. Circuit properly transferred the appeal to us under 28 U.S.C. § 1631 (2006), which allows a court "in the interest of justice" to "transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed." 28 U.S.C. § 1631. As noted above, not only *could* the appeal have been brought in our circuit, it had to be brought here; only we had jurisdiction over the appeal of that order. *See* 28 U.S.C. § 1294. The transfer of the balance of the case to the District Court for the District of Columbia had no effect on our jurisdiction over this immediately appealable order.

B

Having established our appellate jurisdiction, we now turn to Iraq's argument that the district court was, under the FSIA, without subject matter jurisdiction over this case.

A district court's denial of a motion to dismiss for lack of subject matter jurisdiction is subject to interlocutory appeal under the collateral order doctrine. *Phaneuf v. Republic of Indon.*, 106 F.3d 302, 304 (9th Cir. 1997). Under the burden-shifting framework of the FSIA, the defendant must establish a prima facie case "that it is a sovereign state and that the plaintiff's claim arises out of a public act." *Siderman*, 965 F.2d at 708 n.9 (quoting *Meadows*, 817 F.2d at 523) (internal quotation marks omitted). A presumption then arises "that the foreign state is protected by immunity." *Id.* Once the plaintiff has met the threshold of alleging that the defendant was not entitled to immunity due to one of the FSIA exceptions, *see Meadows*, 817 F.2d at 522, the defendant may make either a facial or factual challenge to the district court's subject matter jurisdiction, *see Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (differentiating between facial attacks and fact-based challenges to subject matter jurisdiction).

Where a defendant claims only "that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction," *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004), we treat the challenge as "any other motion to dismiss on the pleadings for lack of jurisdiction," *Holy See*, 557 F.3d at 1073. We therefore determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011) (applying *Iqbal*'s standards to a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim).

If the defendant instead makes a factual attack on subject matter jurisdiction, the defendant may introduce testimony, affidavits, or other evidence to "dispute[ ] the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. Under these circumstances, "no presumptive truthfulness attaches to plaintiff's allegations." *Holy See*, 557 F.3d at 1073 (quoting *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987)) (internal quotation marks omitted). "The plaintiff then has the burden of going forward with the evidence by offering proof that one of the FSIA exemptions applies." *Siderman*, 965 F.2d at 708 n.9 (quoting *Meadows*, 817 F.2d at 522-23); *see also Gates v. Victor Fine Foods*, 54 F.3d 1457, 1463 (9th Cir. 1995). Once the plaintiff has presented such evidence, the defendant bears the burden of proving by a preponderance of the evidence that the exception to sovereign immunity does not apply. *Siderman*, 965 F.2d at 708 n.9 (quoting *Meadows*, 817 F.2d at 522-23). Even where the material facts are disputed, the trial court may still evaluate the merits of the jurisdictional claims. *See Holy See*, 557 F.3d at 1073; *see also* William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, California Practice Guide: Federal Civil Procedure Before Trial ¶ 9:104, at 9-31 (The Rutter Group 2009).

In this case, Iraq made fact-based challenges to plaintiffs' assertion of jurisdiction, and both parties submitted documentary evidence to the district court. On appeal, we must determine whether plaintiffs have carried their burden of offering proof that one or more FSIA exceptions to sovereign immunity are applicable, and Iraq has carried its burden of proving that no exception identified by the plaintiffs is applicable. We review the district court's legal rulings de novo and its factual findings for clear error. *See Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010); *Adler*, 107 F.3d at 723.

## III

Plaintiffs relied on the first and third clauses of the "commercial activity" exception to sovereign immunity as set forth

in § 1605(a)(2). We begin by setting forth the frameworks for evaluating the applicability of these exceptions.

## A

**[4]** The first clause of § 1605(a)(2) makes an exception to a foreign state's sovereign immunity in a case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." The FSIA provides definitions for some of these key terms. A "commercial activity carried on in the United States by a foreign state" means a commercial activity "having substantial contact with the United States." 28 U.S.C. § 1603(e). A "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The Supreme Court has held that a foreign state engages in commercial activity only where it exercises "those powers that can also be exercised by private citizens," or when it acts "in the manner of a private player within the market," but not when it exercises those powers "peculiar to sovereigns." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Weltover*, 504 U.S. at 614) (internal quotation marks omitted). In determining whether an activity is "commercial," a court must determine the activity's commercial character "by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* at 359 (quoting § 1603(d)) (internal quotation marks omitted). "Thus the relevant question 'is whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in trade and traffic or commerce.' " *Lasheen*, 603 F.3d at 1170 (alteration in original) (quoting *Weltover*, 504 U.S. at 614). There is no dispute that the contracts in question are commercial in nature.

The courts have also explained what it means for an action to be "based upon" a commercial activity. According to the Supreme Court, the phrase "based upon" is "read most naturally to mean those elements of a claim that, if proven, would

entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357; *see also id*. ("An action is based upon the elements that prove the claim, no more and no less." (quoting *Santos v. Compagnie Nationale Air France*, 934 F.2d 890, 893 (7th Cir. 1991) (internal quotation marks omitted))). Thus a court must begin its analysis "by identifying the particular conduct" on which the plaintiff's legal action is "based." *Id.* at 356. That "particular conduct" must be a "commercial activity" as defined by the Act, although "the first clause of § 1605(a)(2) [does not] necessarily require[ ] that each and every element of a claim be commercial activity by a foreign state." *Id.* at 358 n.4.

Finally, the requirement that the commercial activity be "carried on in the United States," § 1605(a)(2), means that the lawsuit itself must be based upon the foreign sovereign's commercial activity within the United States. Even if the foreign sovereign regularly conducts other commercial activity in the United States, if that activity "has no connection with, or relationship to, the conduct which gave rise to plaintiff's cause of action" it "will not suffice" to abrogate sovereign immunity under this first clause. *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1383 (8th Cir. 1993) (quoting *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 947 F.2d 218, 221 (6th Cir. 1991)) (internal quotation marks omitted); *see also Am. W. Airlines*, 877 F.2d at 797 (upholding sovereign immunity because the commercial acts in the United States were not the "*specific* acts that form the basis of the suit" (quoting *Joseph v. Office of the Consulate Gen.*, 830 F.2d 1018, 1023 (9th Cir. 1987) (internal quotation marks omitted)).

Moreover, the commercial activities in the United States must be significant ones. *See Grossman*, 991 F.2d at 1384. For example, while a foreign nation's contract negotiations, including a meeting, and telephone and wire communications, are commercial activity in the United States, they are insufficiently significant to meet this exception. *See id.* at 1383-84.

Similarly, where a plaintiff's claim was based on activities in Saudi Arabia (and sounded in tort rather than contract), the plaintiff could not abrogate the foreign nation's sovereign immunity under the first clause of the FSIA by pointing to preliminary commercial activities in the United States. *See Nelson*, 507 U.S. at 357-58.

**[5]** In sum, in order for a foreign state to lose its sovereign immunity under the first clause of § 1605(a)(2): (1) the foreign state's commercial activity in the United States must be the basis of (i.e., a necessary element of) the plaintiff's claim; and (2) that commercial activity must be significant and have substantial contact with the United States.

B

**[6]** The third clause of § 1605(a)(2) creates an exception to a foreign state's sovereign immunity in a case in which the plaintiff's lawsuit is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." Instead of requiring that the legal action be "based upon" commercial activity, as in the first clause, this clause allows the legal action to be based on an act outside of the United States so long as the act was taken "in connection with a commercial activity of the foreign state."

In analyzing the third clause, courts have focused on the language requiring that the act which forms the basis of the lawsuit cause "a direct effect in the United States." In interpreting this language in *Weltover*, the Supreme Court held that an effect is "direct" "if it follows 'as an immediate consequence of the defendant's . . . activity.' " 504 U.S. at 618 (alteration in original) (quoting *Weltover, Inc. v. Republic of Arg.*, 941 F.2d 145, 152 (2d Cir. 1991)); *see also Adler*, 107 F.3d at 726-27.[5] We have explained that a consequence is

---

[5]In reaching this conclusion, the Court rejected earlier judicial interpretations, which had held based on legislative history that an act must be

"immediate" if no intervening act breaks "the chain of causa-tion leading from the asserted wrongful act to its impact in the United States." *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001); *see also id.* at 1083 n.3 (holding that the rele-vant meaning of "immediate" in this context is " 'acting or being without the intervention of another object, cause, or agency' " (quoting Webster's Third New International Dictio-nary 1129 (1986)); *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010) (stating that " 'the requisite imme-diacy' is lacking where the alleged effect 'depend[s] crucially on variables independent of' the conduct of the foreign state" (alteration in original) (quoting *Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 238 (2d Cir. 2002)).

Applying this rule, the D.C. Circuit considered a breach-of-contract claim brought by Cruise Connections, a U.S. corpo-ration, against Canada. *See Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661, 662-63 (D.C. Cir. 2010). Cruise Connections had entered into a con-tract with Canada to provide three cruise ships for housing Canadian security staff near Vancouver during the 2010 Win-ter Olympics, but just when Cruise Connections was in the final stages of negotiating subcontracts, Canada canceled the contract. *See id.* at 663. Cruise Connections alleged that this breach caused it to lose revenue it would have obtained from the subcontractors that supplied the cruise ships and from a travel agency that would have chartered one of the ships. *See id.* Cruise Connections also claimed that the breach resulted in lost revenues from sales that would have been made to pas-sengers on those ships. *See id.* Analyzing Canada's asserted sovereign immunity under the FSIA, the D.C. Circuit held that the lost revenues from the cruise lines and travel agency constituted "direct effects" of the breach because "no inter-vening event stood between [the foreign sovereign's] termina-

---

both "substantial" and "foreseeable" in order to have a "direct effect" in the United States. *Weltover*, 504 U.S. at 617-18.

tion of the contract and the lost revenues" from third parties. *Id.* at 664. On the other hand, the court suggested that lost revenues from shipboard sales were not "direct effects" because such losses, which depended entirely on the decisions of individual purchasers, "might be regarded as subject to an 'intervening event' independent of [the foreign sovereign's] cancellation of the contract." *Id.*

Satisfying the requirement that an effect be "immediate" and thus "direct" is not sufficient by itself to satisfy the "direct effect" prong of the commercial activity exception, however, because the effect must also be more than "purely trivial" or "remote and attenuated." *Weltover*, 504 U.S. at 618. In considering this factor, a court must " 'look to the place where legally significant acts giving rise to the claim occurred' in determining the place where a direct effect may be said to be located." *Adler*, 107 F.3d at 727 (quoting *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1239 (10th Cir. 1994)); *see also id.* at 727 n.4 (citing cases and noting that the Second, Tenth, and Eighth Circuits apply the "legally significant acts" test); *Gregorian v. Izvestia*, 871 F.2d 1515, 1527 (9th Cir. 1989) (to establish a direct effect, the plaintiff must show that " 'something legally significant actually happened in the U.S.' " (quoting *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988))).

Following this reasoning, courts have held that a mere tangential effect in the United States from a breach that occurs elsewhere does not constitute a "direct effect" as contemplated in the third clause of § 1605(a)(2). *See, e.g.*, *United World Trade*, 33 F.3d at 1237-39 (finding no direct effect when a foreign nation's cancellation of an otherwise non-U.S. contract meant that foreign currency no longer needed to be transferred to a U.S. bank to be converted into dollars); *see also Adler*, 107 F.3d at 726-27 (noting that "mere financial loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a 'direct effect' "). As the

Tenth Circuit explained, "[t]he requirement that an effect be 'direct' indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *United World Trade*, 33 F.3d at 1238. Moreover, we may not interpret § 1605(a)(2) "in a manner that would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state." *Id.* at 1239.

On the other hand, when a foreign sovereign breaches a contract by failing to complete a contractual obligation that must be performed in the United States, such a breach is sufficient to be a direct effect in the United States. *See, e.g.*, *Weltover*, 504 U.S. at 618-19. In *Weltover*, Argentina issued bonds and agreed to repay certain bondholders by making deposits into those bondholders' New York banks as the bonds matured. *Id.* at 609-10. When Argentina breached its obligation to make those payments, the bondholders sued in New York district court. *Id.* at 610. The Supreme Court held that Argentina's act of rescheduling the maturity dates on the bonds, which was the basis of the plaintiffs' breach of contract action in the United States, had a direct, non-trivial effect in the United States. *Id.* at 618-19. As the Court explained, "[b]ecause New York was . . . the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id*. at 619; *see also Adler*, 107 F.3d at 727 (holding that, because the plaintiff had instructed Nigeria to make payments to the plaintiff's account in New York, "New York was the place of performance of Nigeria's ultimate contractual obligation," and "its failure to satisfy that obligation necessarily had a direct effect in the United States").

**[7]** Accordingly, there is an exception to a foreign sovereign's immunity under the third clause when (1) an act out-

side the United States forms the basis of the plaintiffs' lawsuit (i.e., constitutes an element of a claim that if proven would entitle a plaintiff to relief on his theory of the case); (2) the act is taken in connection with a foreign sovereign's commercial activity; (3) there is a direct connection between the act and the effect, without any intervening object, cause, or agency; and (4) the effect of the act is legally significant and non-trivial.

IV

We now apply these principles to this case to determine whether Iraq has met its burden of showing that neither of the exceptions to sovereign immunity contained in the first and third clauses of § 1605(a)(2) applies. *See Siderman*, 965 F.2d at 708 n.9 (citing *Meadows*, 817 F.2d at 523).

A

We begin by considering the plaintiffs' assertion that Iraq does not have sovereign immunity from suit under the FSIA because the first clause of the commercial exception in § 1605(a)(2) applies on these facts, i.e., the plaintiffs' action is based "upon a commercial activity carried on in the United States" by Iraq.

According to the plaintiffs' argument, their complaint is based on the cancellation of the contracts, and the contracts are the product of Iraq's commercial activities carried on in the United States because (1) the contracts were made under the auspices of the Oil for Food Program administered in New York by the United Nations and (2) the contracts were executed at the Cyprus Mission to the United Nations, which is located in New York. As further support for this argument, plaintiffs ask us to take judicial notice of documents filed in other district court proceedings in which Iraq took the litigation position that contracts made under the auspices of the Oil

for Food Program constitute commercial activity carried on in the United States.

**[8]** We agree that Iraq's entry into the two contracts for the sale of oil constituted commercial activity. But neither of the activities identified by plaintiffs constitute a "commercial activity carried on in the United States by the foreign state" for purposes of the first clause of § 1605(a)(2). First, Iraq's involvement in the Oil for Food Program is not a "commercial activity." Although Iraq's agreement to comply with the Oil for Food Program's restrictions was a condition precedent to engaging in the transactions at issue, Iraq's participation in the program was solely due to its status as a sovereign. Iraq's invasion of Kuwait, the resulting trade embargo sanction, and Iraq's involvement in the United Nations' Oil for Food Program to relieve the humanitarian needs of its people are public acts, not "the type of actions by which a private party engages in trade and traffic or commerce," *Weltover*, 504 U.S. at 614 (emphasis and internal quotation marks omitted), or actions "in the manner of a private player" within a market, *Nelson*, 507 U.S. at 360. By the same token, the United Nations' oversight of Iraq's activities to further certain international political and humanitarian goals is not a commercial activity carried on by Iraq in the United States, nor does that oversight transform Iraq's activities abroad into significant commercial activities with substantial contacts to the United States. Further, nothing about the Oil for Food Program itself gave rise to the plaintiffs' complaint.[6]

---

[6]Thus we disagree with the dissent's statement that "[w]hat Iraq was doing was what any private player could do, trading oil to obtain money for food." Dissent at 11404. Although we agree that "there is nothing specifically sovereign about bartering oil," a private party trading in oil is not compelled to subject all aspects of its dealings (including the use it may make of any revenues received) to the supervision and control of a United Nations committee. Accordingly, Iraq's participation as a sovereign nation in the Oil for Food Program cannot be the basis for our jurisdiction, because clearly the United Nations' close oversight of Iraq's activities is not the "type of action[ ] by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (emphasis omitted).

**[9]** Nor do we agree with plaintiffs' argument that the execution of the contracts at the Cyprus Mission in New York is sufficiently significant to satisfy the first clause of the commercial activity exception. First, as Iraq argues, plaintiffs presented no evidence that any Iraqi official actually executed the contract in New York. Iraq has established that it is a sovereign state, and so it is entitled to a presumption that it has immunity from suit. *See Siderman*, 965 F.2d at 708 n.9. Because Iraq relies on a fact-based challenge to subject-matter jurisdiction, *see Holy See*, 557 F.3d at 1073, plaintiffs had the burden of presenting their evidence that the disputed FSIA exemption applied. *See Siderman*, 965 F.2d at 708 n.9. Plaintiffs have presented no evidence regarding the locale where Iraq signed the contract. Because plaintiffs failed to carry their initial burden of offering evidence that an exception to immunity applies, we may reject their argument on this ground. *See id.*

**[10]** But even assuming that plaintiffs provided evidentiary support for this factual allegation, their legal argument is wrong: execution of a contract in the United States alone, without more, is not sufficient to satisfy the first clause of § 1605(a)(2). The mere happenstance that a contract is executed at a location within the physical boundaries of the United States, by itself, is not sufficient to constitute a significant activity or a substantial contact for purposes of the first clause of § 1605(a)(2). Rather, as noted by the Supreme Court in a different but related context, a court should consider less formalistic indicia, such as "prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985). Here, plaintiffs have not alleged that substantial prior contractual negotiations, or indeed any activity related to formation of the contracts other than their execution, occurred within the United States. *Cf. Grossman*, 991 F.3d at 1383-84 (holding that a meeting and communications by wire and telephone were insufficiently significant to meet the exception in the first clause of § 1605(a)(2)). Nor did

the contracts require Iraq to undertake any activities in New York. Further, the contracts designated Baghdad as the locale for arbitration of any disputes and provided that the contracts would be construed and governed in accordance with the laws of Iraq. Under these circumstances, the mere signing of the contract in New York (assuming that Iraq did so) is insufficient to meet the test for a commercial activity carried on in the United States by Iraq for purposes of § 1605(a)(2).[7]

Finally, Iraq's litigation position in other legal proceedings is not relevant to our considerations here. Even if Iraq conceded in other litigation that contracts made pursuant to the Oil for Food Program were commercial activities carried on in the United States, judicial estoppel is not a substitute for subject matter jurisdiction, as plaintiffs concede.[8] Rather, a federal court must assure itself of its own jurisdiction to entertain a claim regardless of the parties' arguments or concessions. *See Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 17-18 (1951) ("The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation or by prior action or consent of the parties."); *see also Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227-28 (10th Cir. 2011) (declining to apply judicial estoppel to the question whether the court had Article III jurisdiction to entertain the claim); *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 980-82 (8th Cir. 2009) (same).

---

[7]We also note that plaintiffs' complaint is not "based upon" contract formation, but rather it is based upon Iraq's alleged breach of the contracts. The parties do not dispute that they entered into enforceable contracts. Therefore, proof that the contract was executed is neither an element "that prove[s] the claim" nor the "particular conduct" that forms the basis of plaintiffs' action. *Nelson*, 507 U.S. at 356-57 (internal quotation omitted).

[8]We grant the requests for judicial notice of certain pleadings and court filings in the New York litigation submitted by plaintiffs and Iraq. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (holding that judicial notice of court filings and other matters of public record is proper).

**[11]** Accordingly, we hold that Iraq has met its burden of showing that the exception to sovereign immunity contained in the first clause of 28 U.S.C. § 1605(a)(2) does not apply.

B

We next turn to plaintiffs' argument that the exception to sovereign immunity contained in the third clause of § 1605(a)(2) is applicable to Iraq, i.e., that plaintiffs' claim is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

The plaintiffs argue that Iraq's breach of the contracts had multiple direct effects in the United States. Specifically, the plaintiffs allege that under the contracts, some of the oil intended for purchase was meant for the U.S. market and payment for any oil purchased was to be made by deposit into a New York bank account. Due to the cancellation of the contracts, plaintiffs argue, the oil never reached the United States, and the money was never paid in New York. Therefore, the plaintiffs allege that their complaint is based on Iraq's breach of the two contracts, which resulted in a "direct effect" in the United States.

**[12]** We reject this argument because the alleged effects in the United States, the non-deposit of payments for oil in a New York bank (due to the non-purchase of the oil) and the non-sales of the non-purchased oil to potential customers in the United States, do not constitute direct effects as defined in § 1605(a)(2) and subsequent case law. While the cancellation of the contracts directly precluded plaintiffs from buying oil, the non-deposit of payment for the oil in a New York bank was merely an indirect effect of Iraq's breach and is not the "legally significant" act that gave rise to the plaintiffs' claim, which is based on the breach, not the non-deposit of payment. *See Adler*, 107 F.3d at 727 (a court must " 'look to

the place where legally significant acts giving rise to the claim occurred' in determining the place where a direct effect may be said to be located" (quoting *United World Trade*, 33 F.3d at 1239)). Iraq's breach may have had ripple effects in New York and elsewhere, including depriving a New York bank of the use of funds that might have been deposited in the bank at some future point, but a potential financial loss by an entity in the United States is not, in itself, sufficient to constitute a direct effect. *See id.*

*Weltover* and *Adler* are not to the contrary. Those cases held that the foreign sovereign's failure to perform its obligation to make certain payments necessarily had a direct effect in the United States where the foreign sovereign's place of performance was the United States. *See Weltover*, 504 U.S. at 619 ("Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States . . . ."); *Adler*, 107 F.3d at 730 ("Nigeria was obligated to make payment in New York. Nigeria's acts had a direct effect in the United States."). But here, Iraq had no obligation to perform in the United States; the contracts required Iraq only to deliver oil to the possession of the plaintiffs in either Iraq or Turkey, and the act that forms the basis of plaintiffs' lawsuit, Iraq's cancellation of the contracts, occurred in Iraq. *See Guirlando*, 602 F.3d at 76 ("The decision by a foreign sovereign not to perform is itself an act, but it is not an act in the United States; it is an act in the foreign state."). While the failure of the breaching party to perform a contractual obligation in the United States is a "direct effect," *see Weltover*, 504 U.S. at 618-19, here, by contrast, there was neither a failure by Iraq to perform in the United States nor any other legally significant event in this country.

**[13]** Nor is there any immediate connection between Iraq's cancellation of the contracts and the failure of oil to reach customers in the United States. While the contracts generally indicated that the United States was one of several intended

markets for the oil, neither Pentonville nor Marblearch had assumed any contractual obligation to U.S. buyers. Many additional steps remained, including such fundamental requirements as finding potential U.S. purchasers and negotiating mutually acceptable agreements. Indeed, the only evidence that plaintiffs' had identified any potential purchasers of oil at all appeared in Terenkian's declaration (submitted into evidence by Iraq), which indicated that he was in discussions with an Italian refinery. Because the contracts forbade plaintiffs from using third-party refineries without the permission of Iraq, the plaintiffs could not have proceeded even with this non-U.S. sale without obtaining such permission, another contingency that weighs against the plaintiffs' claim of a direct effect in the United States. The distant potential of selling oil to customers in the United States sharply contrasts with the situation in *Cruise Connections*, where the court emphasized that the foreign nation's breach of contract "led inexorably to the loss of revenues under the third-party agreements," which either had been finalized, or were final but for the signature. 600 F.3d at 665. Rather, this case is more like the remote and attenuated losses from potential shipboard sales in *Cruise Connections* that likely did not amount to "direct effects" because they "might be regarded as subject to an 'intervening event' independent of [the foreign sovereign's] cancellation of the contract." *Id*. In sum, any connection between Iraq's cancellation of the contracts and Iraqi oil not reaching customers in the United States, if it existed at all, is too "remote and attenuated," *Weltover*, 504 U.S. at 618, to qualify as a "direct effect" under § 1605(a)(2).

[14] Accordingly, because no legally significant act had a direct effect in the United States, we hold that Iraq has met its burden of showing that the third clause of 28 U.S.C. § 1605(a)(2) does not apply.

V

**[15]** Iraq has therefore carried its burden of proving that neither of the "commercial activity" exceptions to sovereign immunity raised by plaintiffs is applicable. Plaintiffs' claim is based on neither a legally significant commercial act that occurred in the United States nor an act that had a direct and legally significant effect in the United States. Accordingly, the federal courts have no subject matter jurisdiction over Iraq in this action. *See* 28 U.S.C. § 1604. Although we may decry the practices conducted by the regime of Saddam Hussein, *see* Dissent at 11402, 11404, we best serve our nation's principles of equity and justice by applying the law in a fair and even-handed manner to all parties before us. We therefore reverse, vacate the district court's transfer of venue to the District of Columbia, and remand to the district court with instructions to dismiss.[9]

**REVERSED, VACATED, AND REMANDED.**

---

NOONAN, Circuit Judge, dissenting:

Iraq, run by the dangerous despot, Saddam Hussein, entered into two contracts to buy oil from two companies owned by a United States citizen M.K. Terenkian. The contracts were executed in New York City. Terenkian was to pay for the oil by letters of credit drawn on a bank in New York

---

[9]Because we lack subject matter jurisdiction, we do not reach Iraq's argument that the case should be dismissed for failure to arbitrate. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983) (holding that there must be some independent basis for federal jurisdiction before arbitration can be compelled); *see also Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1215 n.1 (9th Cir. 2008) (observing, in a case involving enforcement of an arbitration agreement, that "[w]e must assure ourselves that the constitutional standing requirements are satisfied before proceeding to the merits").

City. The contracts were approved in New York City by the committee of the United Nations managing its Oil for Food Program. Formed in New York, the contracts were to be paid for in New York. The contracts received necessary approval in New York. It is very difficult to see why these were not all significant steps linking the contracts to the United States.

The majority suggests that the place of formation of the contracts was not significant because their formation is not at issue. Formation was the first essential element for the plaintiffs to establish in order to establish jurisdiction. The plaintiffs established that formation occurred in New York City.

The majority finds that the place where payment was to be made was not significant. In our case, as in most cases, the place of performance of a promise to pay is significant. Terenkian would not have wanted payment to be made in Baghdad.

The majority argues that Iraq's participation in the Oil for Food Program was not commercial activity by Iraq but, rather, a humanitarian relief program undertaken to obtain food for the people of Iraq. The majority cites as authority *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) and *Adler v. Republic of Nigeria*, 107 F.3d 720 (1997). Each of these cases found a foreign government to be liable for its commercial activity in the United States.

As Justice Scalia set out for a unanimous Supreme Court "commercial" is the key to the exception for commercial activity created by the Foreign Sovereign Immunities Act. Its meaning is to be found in "the restrictive theory at the time the statute was enacted." *Weltover* at 613. Under this approach, a foreign state that exercises powers that can also be exercised by private parties is not immune as a sovereign. *Id.* at 614. So in *Weltover*, Argentina acted not "as regulator of a market" but "as a private player within it" and was not immune. *Id.* As Justice Scalia pointed out, the motive of the

state was irrelevant. It was the type of action that counted. *Id.* at 614. In our case, the majority focuses on Iraq's "humanitarian" motive, which is irrelevant. What Iraq was doing was what any private player could do, trading oil to obtain money for food.

In *Adler*, we followed *Weltover* and looked not to "the motive" or "the purpose" of the foreign government but to whether its actions were of the type "by which a private party engages in commerce." *Adler* at 724. Hence, we held Nigeria might be sued when through the government-owned Nigerian National Petroleum Corporation it entered into a computerization of certain oil fields in Nigeria. As we observed "there is nothing uniquely sovereign about computerizing oil fields." *Id.* So here there is nothing specifically sovereign about bartering oil.

The majority brushes off the showing that in New York today Iraq takes the position that there is federal jurisdiction of claims under the Oil for Food Program. The majority characterizes that as a "litigation position," which does not create jurisdiction. True, it does not create jurisdiction. But positions cannot be taken arbitrarily or fraudulently in filing or answering a complaint. A position asserted in such a document is sworn to be true. Iraq may not honestly say there is jurisdiction in New York and deny that there is jurisdiction of similar claims in San Diego.

In our case, in order to protect its treasury the Republic of Iraq has chosen to step into the shoes of the wretched regime that once ruled the country. Equities do not create jurisdiction. Equities may discourage us from stretching beyond precedent to find reasons for letting Iraq off the hook on which the Hussein regime hung after its alleged attempts at extorting bribes had failed.

I would affirm the district court.