**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAROL P. SACHS,
           *Plaintiff-Appellant*,

    v.

REPUBLIC OF AUSTRIA; OBB
HOLDING GROUP; OBB
PERSONENVERKEHR AG,
           *Defendants-Appellees*.

No. 11-15458

D.C. No.
3:08-cv-01840-
VRW

OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, District Judge, Presiding

Argued and Submitted En Banc
March 21, 2013—San Francisco, California

Filed December 6, 2013

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Diarmuid F. O'Scannlain, Barry G. Silverman, Susan P.
Graber, Kim McLane Wardlaw, Raymond C. Fisher,
Ronald M. Gould, Marsha S. Berzon, Johnnie B.
Rawlinson, and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge O'Scannlain;
Dissent by Chief Judge Kozinski

# SUMMARY[*]

## Foreign Sovereign Immunities Act

Reversing the district court's dismissal of an action for lack of subject matter jurisdiction, the en banc court held that a foreign-state owned common carrier engages in commercial activity in the United States, and thus is not immune from suit under the Foreign Sovereign Immunities Act, when it sells tickets in the United States through a travel agent, regardless of whether the travel agent is a direct agent or subagent of the common carrier.

Agreeing with the Second and D.C. Circuits, the en banc court held that the sale of a Eurail pass to the plaintiff could be imputed to the defendant for purposes of establishing that it carried on commercial activity in the United States. In addition, the sale created "substantial contact" with the United States. The en banc court also held that the plaintiff's claims, which arose from a fall when she attempted to board a train in Austria, were "based upon" the defendant's commercial activity in the United States because the plaintiff showed a nexus between her claims and the sale of the Eurail pass. The en banc court held, therefore, that the FSIA's commercial-activity exception applied.

Dissenting, Judge O'Scannlain, joined by Chief Judge Kozinski and Judge Rawlinson, wrote that the commercial-activity exception did not apply because the sale of the Eurail

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

pass was not attributable to the defendant, and so the plaintiff failed to allege commercial activity "by the foreign state."

Dissenting, Chief Judge Kozinski agreed with Judge O'Scannlain that a foreign sovereign does not engage in commercial activity in the United States when a subagent over which it exercises no direct control sells tickets for passage on a common carrier wholly owned by that sovereign. Chief Judge Kozinski wrote that he would affirm the district court on the ground that the plaintiff's claim arose from events that transpired entirely in Austria, and thus was not "based upon" commercial activity carried on in the United States.

## COUNSEL

Geoffrey Becker, Becker & Becker, Lafayette, California, for Plaintiff-Appellant.

Juan C. Basombrio, Dorsey & Whitney LLP, Irvine, California, for Defendant-Appellee.

**OPINION**

GOULD, Circuit Judge:

We must decide whether a resident of the United States has a domestic forum in which to bring a claim against a foreign common carrier, operated by a foreign sovereign entity, that sells tickets through a third-party agent or subagent in the United States. Carol P. Sachs filed a complaint against OBB Personenverkehr AG (OBB) in the United States District Court for the Northern District of California. Sachs sought damages for traumatic injuries that she sustained while trying to board an OBB train in Innsbruck, Austria.

The district court granted OBB's motion to dismiss for lack of subject-matter jurisdiction, concluding that OBB, as an instrumentality of the Republic of Austria, was immune from suit under the Foreign Sovereign Immunities Act of 1976 (FSIA). On appeal, Sachs argues that under the first clause of the FSIA's commercial-activity exception, the district court has subject-matter jurisdiction over her claims. We agree. A foreign-state owned common carrier, such as a railway or airline, engages in commercial activity in the United States when it sells tickets in the United States through a travel agent regardless of whether the travel agent is a direct agent or subagent of the common carrier. Under the FSIA, federal courts of the United States will have subject-matter jurisdiction over actions against a foreign sovereign common carrier that engages in commercial activity of this kind as long as the plaintiff's claims are based upon that activity.

# I

OBB Personenverkehr AG is a separate legal entity wholly owned by OBB Holding Group, a joint-stock company created by the Republic of Austria. OBB Holding Group is wholly owned by the Austrian Federal Ministry of Transport, Innovation, and Technology. OBB's main function is to operate passenger rail service within Austria. Like many of its counterparts in other European countries, OBB is a member of the Eurail Group, which is an association organized under Luxemburg law. According to OBB, Eurail Group is responsible for marketing and selling rail passes. Eurail passes are marketed to non-European residents, as they cannot be used by residents of Europe and nearby countries.

In early March 2007, Sachs purchased a four-day Eurail pass from the Rail Pass Experts (RPE) for travel in Austria and the Czech Republic. RPE is located in Massachusetts, but Sachs bought the Eurail pass online through the RPE website. Sachs's Eurail pass listed various disclaimers, including that "the issuing office is merely the intermediary of the carriers in Europe and assumes no liability resulting from the transport." The Eurail pass also stated that it is "non-transferable and only valid upon presentation of a passport or a valid travel document replacing the passport."

In late April 2007, Sachs arrived in Innsbruck, Austria, and presented her Eurail pass to OBB to purchase a couchette reservation for her trip from Innsbruck to Prague. Although Sachs would have been able to board the train to sit in an unassigned seat with the Eurail pass that she bought from RPE, she paid the €30.90 fee to upgrade her pass and reserve

a couchette bed. The Eurail pass required customers to pay separately for upgrades of this kind.

When Sachs tried to board the train, she fell between the tracks. Her legs were crushed by the moving train. As a result of these injuries, both of Sachs's legs were amputated above the knee. Sachs alleges that OBB caused her injuries by negligently moving the train while she attempted to board. OBB disputes this allegation, claiming that the train was already moving when Sachs tried to board.

Sachs filed suit against OBB in the United States District Court for the Northern District of California.[1] Her complaint asserts claims for negligence; strict liability for a design defect; strict liability for failure to warn about a design defect; breach of implied warranty of merchantability; and breach of implied warranty of fitness. To support these claims, Sachs alleges (a) that she purchased the Eurail pass through OBB's agent Eurail and the American-based company RPE; (b) that through the Eurail pass OBB agreed to provide railway transportation to Sachs during her April 2007 visit to Austria; and (c) that OBB, as a common carrier, owed her a duty of "utmost care."

OBB filed a motion to dismiss on June 21, 2010, arguing that it was entitled to sovereign immunity under the FSIA. In the alternative, OBB also argued that Sachs's complaint should be dismissed for *forum non conveniens*, lack of

---

[1] Sachs's complaint also named the Republic of Austria and the OBB Holding Group as defendants. The Republic of Austria was dismissed from the lawsuit when Sachs did not oppose the Republic of Austria's motion to dismiss. OBB Holding Group was not properly served and is not a party to this litigation.

personal jurisdiction, and international comity. After a hearing and supplemental briefing on the motion, the district court granted OBB's motion to dismiss for lack of subject-matter jurisdiction on foreign-sovereign-immunity grounds. *Sachs v. Republic of Austria*, No. C 08-1840 VRW, 2011 WL 816854, at *4 (N.D. Cal. Jan. 28, 2011) (unpublished). The district court concluded that Sachs had not shown a connection between OBB and RPE sufficient to create a principal-agent relationship. As a result, the district court found that RPE's commercial activity in the United States could not be imputed to OBB. Sachs timely appealed.

A divided three-judge panel of this court affirmed. *Sachs v. Republic of Austria*, 695 F.3d 1021, 1029 (9th Cir. 2012). The majority of judges agreed on result but not reasoning. Relying on our previous decision in *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) (per curiam), the majority opinion concluded that RPE's sale of the Eurail pass could not be imputed to OBB for purposes of establishing jurisdiction under the FSIA's commercial-activity exception. *Sachs*, 695 F.3d at 1025–26. The concurrence agreed that the district court properly dismissed the case for lack of subject-matter jurisdiction, but it argued that *Holy See* was inapposite because that case addressed a different exception under the FSIA. Instead, the concurrence argued that Sachs's claim failed under *Sun v. Taiwan*, 201 F.3d 1105 (9th Cir. 2000), because Sachs did not allege facts sufficient to show that her claims were "based upon" the sale of the Eurail pass in the United States. *Sachs*, 695 F.3d at 1029–30 (quoting 28 U.S.C. § 1605(a)(2)). The dissent explained that both *Holy See* and *Sun* were distinguishable from Sachs's case and that the plain language of the FSIA permits jurisdiction over OBB. *Id*. at 1032–33.

We ordered rehearing en banc to clarify whether the first clause of the FSIA commercial-activity exception applies to a foreign sovereign when a person purchases a ticket in the United States from a travel agency for passage on a commercial common carrier owned by that foreign state.

## II

We review *de novo* the district court's determination of immunity under the FSIA. *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010). A defendant asserting foreign sovereign immunity "may make either a facial or factual challenge to the district court's subject matter jurisdiction." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012), *cert. denied*, 2013 WL 1723794 (U.S. Oct. 7, 2013) (No. 12-1261). A facial challenge argues only that the facts as alleged in the complaint are insufficient to state a claim. *Id*. A factual challenge disputes the truth of the allegations that would otherwise be sufficient to invoke federal jurisdiction. *Id*.

OBB's challenge is factual. OBB submitted documentary evidence and a declaration to prove OBB's status as an agency or instrumentality of the Austrian government and to dispute the truth of Sachs's allegations that RPE sold the ticket as an authorized agent of OBB. Sachs submitted her own declaration and evidence to support her claim of jurisdiction under the FSIA's commercial-activity exception. When the district court relies on such evidence for its decision, we generally treat the jurisdictional attack as factual. *See Holy See*, 557 F.3d at 1073. For such a factual challenge, we must determine (1) whether Sachs has carried her burden to prove, by offering evidence, that the commercial-activity exception to foreign sovereign

immunities applies and (2) whether OBB has carried its burden to prove, by showing a preponderance of evidence, that the exception is not applicable. *See Terenkian*, 694 F.3d at 1131–32.

## III

The doctrine of foreign sovereign immunity has its roots in the common law, tracing back to the Supreme Court's decision in *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812), which extended "virtually absolute immunity to foreign sovereigns as 'a matter of grace and comity.'" *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)). After *Schooner Exchange*, federal courts routinely deferred to the State Department on whether to assume jurisdiction over an action against a foreign sovereign or its instrumentality. *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004).[2] In 1952, the State Department adopted a "restrictive" theory of sovereign immunity. *Samantar*, 560 U.S. at 312. The restrictive theory of sovereign immunity recognizes that sovereigns are immune "with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)." *Altmann*, 541 U.S. at 690 (internal quotation marks omitted). This shift was based on the philosophy that where foreign sovereigns engage in commercial dealings there is "a much smaller risk

---

[2] Under this practice, the State Department would usually file a suggestion of immunity in the court at the request of the foreign state and the district court would grant immunity on that basis. *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1126 (9th Cir. 2010). In the absence of suggestion from the State Department, the district court would determine jurisdiction based on the established policy of the State Department. *Id*.

of affronting their sovereignty." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703 (1976) (plurality).

In 1976, Congress codified the State Department's restrictive theory of sovereign immunity in the FSIA, which established a comprehensive "set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities" and shifted the primary responsibility for determining immunity to the federal courts. *Altmann*, 541 U.S. at 691 (quoting *Verlinden B.V.*, 461 U.S. at 488). The FSIA establishes a presumption of immunity for foreign states but carves out specified exceptions to that grant of immunity. *Id*. The FSIA exceptions are "the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." *Peterson*, 627 F.3d at 1122 (quoting *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434 (1989)).

The exception relevant to this appeal is the first clause of the commercial-activity provision, which provides that a foreign state is amenable to suit where the plaintiff's action is "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2).[3] This clause has two parts: (1) the foreign sovereign must have carried on commercial activity within the United States; and (2) the claim must be based upon that activity.

---

[3]"Courts have construed this commercial activity provision to have three independent clauses, and have used different criteria for each of the three separate clauses to assess a claimed exception." *Terenkian*, 694 F.3d at 1127. We review only the first of these clauses here, and we use the term "commercial-activity exception" to refer only to that clause.

As for the first part, commercial activity occurs when a foreign state acts as a private player within the market or exercises powers that can also be exercised by private citizens. *Terenkian*, 694 F.3d at 1132. Commercial activity can be "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* (quoting 28 U.S.C. § 1603(d)). "In determining whether an act or activity is commercial, we must look to its nature, not its purpose." *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 708 (9th Cir. 1992). To be "'carried on in the United States'" there must be "substantial contact" between the commercial act and this country. *Terenkian*, 694 F.3d at 1132 (quoting 28 U.S.C. § 1603(e)).

As for the second part, "based upon" means "those elements of a claim that, if proven, would entitle a plaintiff to relief." *Id*. (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993)). That is, the commercial activity that occurs within the United States must be connected with the conduct that gives rise to the plaintiff's cause of action. *Id*. at 1132–33; *see also Am. W. Airlines, Inc., v. GPA Grp. Ltd.*, 877 F.2d 793, 796 (9th Cir. 1989).

## IV

Two main issues are raised on appeal: (1) whether the sale of the Eurail pass, as the underlying commercial activity,[4] can

---

[4] The district court concluded, based on the agreement of the parties, that "the only relevant commercial activity within the United States was plaintiff's March 2007 purchase of a Eurail pass from the Rail Pass Experts." We consider only the relevant conduct as defined by the district court. *See Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 781 (9th Cir. 1991) (accepting the district court's definition of relevant conduct when not clearly erroneous).

be imputed to OBB for purposes of establishing that OBB carried on commercial activity in the United States; and, if so, (2) whether Sachs's claims are "based upon" that commercial activity as required by the commercial-activity exception. The parties agree that OBB is an agency or instrumentality of the Republic of Austria and that it qualifies as a foreign state for purposes of the FSIA. They also agree that the sale of a Eurail pass constitutes a commercial activity under the FSIA. We must first determine if there is a relationship between OBB and RPE sufficient to impute RPE's commercial act within the United States to OBB. If we conclude such a relationship exists, then we must determine if there is a nexus between Sachs's claims and the underlying commercial activity sufficient to show that the claims of Sachs are "based upon" the commercial activity.

## A

The first clause of the commercial-activity exception gives United States courts subject-matter jurisdiction over any case against a foreign state or its instrumentality "in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). To apply this exception to Sachs's claims against OBB, there must be a sufficient connection between OBB and RPE's sale of a Eurail pass within the United States to support the conclusion that OBB "carried on" commercial activity within the United States. *Id.* We conclude that there is.

The plain text of the FSIA indicates that the first clause of the commercial-activity exception encompasses situations in which a foreign state carries on commerce through the acts of an independent agent in the United States. The FSIA defines

"commercial activity carried on in the United States by a foreign state" as "commercial activity carried on by such state and having substantial contact with the United States." *Id*. § 1603(e). This definition requires two elements to establish that a foreign state carried on commercial activity in the United States: (1) that the foreign state carries on commercial activity and (2) that commercial activity has "substantial contact" with the United States. *See Nelson*, 507 U.S. at 356 (establishing that jurisdiction requires a plaintiff's action to be "'based upon' some 'commercial activity' by [a foreign state] that had 'substantial contact' with the United States").

**1**

The FSIA's legislative history shows that Congress intended the commercial-activity exception to be read broadly to "include not only a commercial transaction performed and executed in its entirety in the United States, but also a commercial transaction or act having a 'substantial contact' with the United States." H.R. Rep. No. 94-1487, at 17 (1976). Notably, neither the statute nor the legislative history defines how the commercial activity within the United States must be "carried on" but both suggest that "the 'carried on by' requirement can be interpreted in light of broad agency principles." *Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1105 (D.C. Cir. 1983). Under traditional agency principles, the foreign state may engage in commerce in the United States indirectly by acting through its agents or subagents. *See Phaneuf v. Republic of Indon.*, 106 F.3d 302, 307–08 (9th Cir. 1997) (establishing that a foreign state can conduct commercial activity through its agents). As long as the agent or subagent acts with actual authority, those acts can be imputed to the foreign state. *Id*.

The Second Circuit and the D.C. Circuit have both applied this principle of imputing the acts of a subagent to a foreign state under the first clause of the commercial-activity exception.[5]          Both have applied the commercial-

---

[5] The dissent of Judge O'Scannlain virtually ignores (and the dissent of Chief Judge Kozinski entirely ignores) the two cases that are most like this one, *Kirkham v. Société Air France*, 429 F.3d 288, 290, 293 (D.C. Cir. 2005), and *Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China*, 822 F.2d 11 (2d Cir. 1987), by arguing that those considered decisions of the D.C. Circuit in *Kirkham* and the Second Circuit in *Barkanic* "do not analyze when the acts of agents can be attributed to a foreign state." Judge O'Scannlain Dissent at 49. We agree that the issue was not explicitly raised in those opinions, as noted in the dissent on the three-judge panel, but we do not agree with the argument by the dissent of Judge O'Scannlain on this en banc panel aimed at discrediting the force of these cases for us. Further, the dissent of Judge O'Scannlain does not acknowledge that its view, if adopted, would create a circuit split with those decisions of the D.C. Circuit and Second Circuit. At the time our prior three-judge panel had decided this case, the jurisdictional argument on which the dissent of Judge O'Scannlain relies had not even been raised by the Republic of Austria in its briefing or in its oral argument. Because the issue is jurisdictional, we have considered the Republic of Austria's new contentions about agency even though they were not previously presented. *Infra* note 7. Whether or not in *Barkanic* the government of the People's Republic of China conceded agency from the sale of its ticket by a travel agent in the United States, and whether or not in *Kirkham* the government of France conceded agency from the sale of its ticket by a travel agent in the United States, is beside the point. Because the issue is jurisdictional, these other circuits, like us, had an independent duty to assess jurisdiction. If the sale by the travel agent was not sufficient for jurisdictional purposes, then the district courts would have been without jurisdiction and the circuit courts should not have proceeded to render decision accepting that the district courts had jurisdiction over the foreign common carriers by virtue of the commercial-activity exception, and the sale in the United States by the travel agency. Thus the position of the dissent of Judge O'Scannlain creates a conflict with the two other United States Courts of Appeals that have considered parallel cases where a travel agent in the United States sold a ticket for

activity exception where the commercial act in the United States was that of a travel agent acting for the foreign sovereign. In *Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China* (CAAC), the Second Circuit concluded that the first clause of the commercial-activity exception applied to the Chinese airline CAAC based on the sale of a plane ticket in the United States by a third-party agent. 822 F.2d 11, 13 (2d Cir. 1987). CAAC had entered into an agreement with Pan American World Airways whereby Pan American would act as a general sales agent for CAAC in the United States. *Id*. at 12. The tickets in question were not purchased directly through Pan American but through Pan American's agent, Vanslycke & Reeside Travel, Inc. *Id*. Similarly, in *Kirkham v. Société Air France*, the D.C. Circuit applied the commercial-activity exception to a suit against Air France which was based on the sale of airline tickets through a D.C. travel agency for travel in France. 429 F.3d 288, 290, 293 (D.C. Cir. 2005). Because Congress passed the FSIA to promote uniformity in the treatment of foreign sovereign immunity, and because we think that Congress intended to permit suit in the United States against foreign sovereign common carriers that sell

passage on a common carrier owned by a foreign government. We do not disagree that there could be "many instances in which Americans who wish to sue foreign sovereigns can only do so overseas," Judge O'Scannlain Dissent at 50, but there is no reason to think that Congress intended that result when a foreign common carrier sells tickets targeting Americans through agents in the United States. The dissent of Judge O'Scannlain notes that the general rule requiring suit of foreign sovereigns only overseas is a result Congress intended "in many instances," *id.*, but the dissent of Judge O'Scannlain fails to give credence to the plain meaning of the language Congress inserted excepting the situation when the foreign sovereign has engaged in commercial activity in the United States from which a claim springs.

tickets in the United States through agents, we see no compelling reason to create a split with our sister circuits. *See Kelton Arms Condo. Owners Ass'n. v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003) (When a law is "best applied uniformly, . . . we decline to create a circuit split unless there is a compelling reason to do so.").

Sachs's claim is no different in substance, for purposes of assessing sovereign immunity, from those analyzed by our sister circuits.   Like the travel agents in *Kirkham* and *Barkanic*, RPE is a subagent of OBB through Eurail Group. Under traditional theories of agency, RPE's act of selling the Eurail pass to Sachs within the United States can be imputed to OBB as the principal.  Where a common carrier authorizes a travel intermediary to "issue tickets on its behalf and to collect and hold customer payment, the intermediary acts as the [carrier's] agent."  Restatement (Third) of Agency § 3.14 cmt. c (2006).   Here, Eurail Group markets and sells rail passes for transportation on OBB's rail lines, making Eurail Group an agent of OBB.  Eurail Group enlists subagents, like RPE, to sell and market its passes worldwide.  Eurail Group's use of these subagents establishes a legal relationship between OBB (the principal) and RPE (the subagent): "As to third parties, an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent."  Restatement (Third) of Agency § 3.15 cmt. d (2006).   OBB admits as much in describing the relationship between OBB and RPE: "you have the operator, you have a separate legal entity, then you have a marketing arm, then you have a general agent."

OBB argues that even if an agency relationship exists between it and RPE, RPE still lacked actual authority to sell the Eurail pass.  We disagree.  RPE's authority to sell the

Eurail pass derives from the original authority that OBB granted to Eurail Group to market and sell passes for transportation on its rail lines. Indeed, Andreas Fuchs, a member of the Board of Management of OBB, conceded in his declaration that this Eurail pass entitled Sachs to board the train in Innsbruck. Moreover, RPE's actual authority to sell the Eurail pass can be inferred from OBB's sale of the couchette bed upgrade to Sachs. Sachs could purchase the couchette upgrade only if she had a valid Eurail pass. Otherwise, she would have been required to purchase an entirely new ticket, not just an upgrade. If RPE had impermissibly sold the Eurail pass to Sachs, OBB would have had no duty to honor the pass. But it did. It cannot now sensibly argue that the sale of that pass by RPE in the United States was unauthorized.[6] Because we conclude RPE acted as an authorized agent of OBB, we impute RPE's sale of the Eurail pass in the United States to OBB. *See Phaneuf,* 106 F.3d at 307–08 ("[A]n agent's deed which is based on the actual authority of the foreign state constitutes activity 'of the foreign state.'") (quoting 28 U.S.C. § 1605(a)(2)).

Our case law is not to the contrary. In *Holy See*, we considered what acts performed by the Holy See's domestic corporations could be attributed to the Holy See for purposes of the non-commercial torts exception under 28 U.S.C. § 1605(a)(5). *Holy See*, 557 F.3d at 1076–78. In that context, we found it appropriate to adopt the standard articulated by the Supreme Court in *First National City Bank v. Banco Para el Comercio Exterior de Cuba* (*Bancec*),

---

[6] We also agree with Sachs that even if we were to conclude that the sale was originally unauthorized, this ratification of the pass by OBB gives it the "effect as if originally authorized." *Rayonier, Inc. v. Polson*, 400 F.2d 909, 915 (9th Cir. 1968).

462 U.S. 611 (1983). *Id*. Drawing on common-law corporate principles, the Supreme Court in *Bancec* adopted and applied a presumption of separate juridical status that can be overcome only when (1) "'a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created,'" or (2) "when recognizing the separate status of a corporation 'would work fraud or injustice.'" *Holy See*, 557 F.3d at 1077–78 (quoting *Bancec*, 462 U.S. at 629).

Both *Bancec* and *Holy See* are distinguishable because they determined agency in the context of assessing responsibility of corporate affiliates. In contrast, Sachs's allegations are not based on a corporate relationship between OBB and RPE, but rather on principles of agency. Unlike Cuba and its official bank, Bancec, or the Holy See and its domestic corporations, OBB and RPE are "entirely distinct" entities. *See Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 535 (5th Cir. 1992). "There is neither common ownership nor any similar legal relationship between these entities." *Id*. Thus *Bancec*'s definition of agency for purposes of piercing the corporate veil is inapposite—"[o]ne cannot pierce a non-existent corporate veil." *Id*. The day-to-day control inquiry under *Bancec* makes no sense here where the question is "whether a particular type of agency relationship is sufficient under the commercial activity exception." *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006) (distinguishing *Bancec* from the inquiry of whether an individual agent had authority to bind the foreign state); *see also Phaneuf*, 106 F.3d at 307 n.3 (distinguishing the "alter ego" analysis).

OBB contends that common-law principles of agency are inapplicable under the plain language of the FSIA unless the purported agent first meets the statutory definition of "agency

or instrumentality of a foreign state" under § 1603(b).[7] Section 1603(b) defines an "agency or instrumentality of a foreign state" as any entity:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State or of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). OBB argues that this definition of agency applies throughout the FSIA to limit who could be considered an agent of a foreign state. Under this theory, the court can consider common-law definitions of agency only after the statutory definition of agency is met. OBB contends that because RPE cannot meet the definition of agency under § 1603(b), RPE's sale of the Eurail pass cannot be imputed to OBB and no jurisdiction exists under the FSIA. We reject this contention.

---

[7] OBB did not initially brief this argument before our court. We do not consider it waived, however, because it goes to our independent duty to determine subject-matter jurisdiction. *See Lasheen*, 603 F.3d at 1171 n.3 ("[C]hallenges to subject-matter jurisdiction cannot be waived . . . ."). Also, after oral argument we ordered supplemental briefing on this issue.

The plain text of the FSIA does not support OBB's proposed framework for determining whether RPE is an agent of OBB. Section 1603(b) defines what type of entity can be considered a foreign state for purposes of claiming sovereign immunity. If an entity cannot show that it meets that definition then it is not entitled to sovereign immunity. Whether an entity meets the definition of an "agency or instrumentality of a foreign state" to claim immunity is a "completely different question" from whether the acts of an agent can be imputed to a foreign state for the purpose of applying the commercial-activity exception. *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 n.1 (9th Cir. 1995) (quoting *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 176 n.5 (5th Cir. 1989)).

Common sense also tells us that an agent that carries on commercial activity for a foreign sovereign in the United States does not need to be an agency or instrumentality of a foreign state under § 1603(b). Foreign sovereigns invariably must act through agents, and if they engage in commercial activity in the United States it will necessarily be through an agent, whether that agent is its own employee or a separate company in an agency or subagency relationship.

Further, it is a well-established canon of statutory interpretation that "when a statute covers an issue previously governed by the common law, we interpret the statute with the presumption that Congress intended to retain the substance of the common law." *Samantar*, 560 U.S. at 320 n.13. To abrogate common-law principles of agency, the FSIA "must speak directly to the question addressed by the common law." *United States v. Best Foods*, 524 U.S. 51, 63 (1998) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). Because the FSIA codified our common law of

sovereign immunity, *Samantar*, 560 U.S. at 311, we begin with the presumption that the statute maintains common-law principles. That Congress defined the term "agency or instrumentality of a foreign state" does not convince us that Congress intended to displace common-law agency principles under the statute for purposes of assessing commercial activity within the United States.

OBB asks us to read this definition to apply not only to the phrasal term "agency or instrumentality of a foreign state" but also to the individual terms "agency" and "agent." OBB's advocated reading strains the plain language of the FSIA, renders the bulk of the phrase superfluous, and ignores that § 1603(b) defines a singular phrasal term wherein all words are important. Each word within the defined term does not hold the same meaning individually that it has when placed alongside the other terms in the defined phrase. The three elements listed in § 1603(b) define only what constitutes an "agency or instrumentality of a foreign state." *See Samantar*, 560 U.S. at 314 (describing this as a single term). They do not give meaning to the word "agency" or "agent" if used alone. If we were to adopt OBB's preferred reading, then § 1605A's references to an "agent" of a foreign state "acting within the scope of his or her . . . agency" becomes illogical. We will not "construe the statute in a manner that is strained and, at the same time, would render a statutory term superfluous." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476–77 (2003).

The position that OBB advances would negate the possibility of commercial activity by a state-owned railway or airline within the United States through a travel agent. We cannot believe that this is what Congress intended. Throughout the world many foreign states own and operate

legally independent passenger railways and airlines, which may qualify for sovereign immunity as an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b).**[8]**  Foreign states are also heavily involved in the airline industry.**[9]**  Given the prevalence of these rail lines and

---

**[8]** For instance, Canada, India, Israel, Korea, and Thailand each provides passenger services through state-owned railways. *See* Via Rail Canada, Inc., http://www.viarail.ca/en/about-via-rail (last visited November 15, 2013); Indian Railways, http://www.indian railways.gov.in/# (last visited November 15, 2013); Israel Railways, http://www.rail.co.il/EN/About/ Pages/about.aspx (last visited November 15, 2013); Korail Korean Railroad, http://www.korail.com/en/ (last visited November 15, 2013); State Railway of Thailand, http://www.railway.co.th/home/srt/about/his tory.asp?lenguage=Eng (last visited November 15, 2013).

**[9]** According to an unofficial 2008 compilation by the United Nations's International Civil Aviation Organization the following airlines, and many others, are 51 to 100 percent government owned: Aeroflot Russian Airlines, Air Botswana, Air Burundi, Air China, Air India, Air Jamaica, Air Madagascar, Air Malawi, Air Tanzania, Air Zimbabwe, Bahamasair, Belavia Belarusian Airlines, Bulgaria Air, Cameroon Airlines, Cayman Airways, Croatia Airlines, CSA Czech Airlines, Cubana de Aviación, Druk Air (Royal Bhutan Airlines), Egyptair, Emirates Airlines, Eritrean Airlines, Ethiopian Airlines, Finnair, Garuda Indonesia, Ghana International Airlines, Lao Airlines, Libyan Arab Airlines, LOT Polish Airlines, Malaysia Airlines, Myanma Airways (Myanmar), Orbi Georgian Airways, Pakistan International Airlines, Polynesian Airlines (Samoa), Royal Nepal Airlines, Rwanda Air Express, Saudi Arabian Airlines, Singapore Airlines, South African Airways, TAP Portugal, and Vietnam Airlines. *List of Government-owned and Privatized Airlines* (unofficial preliminary compilation), Int'l Civil Aviation Org., (July 4, 2008), *available at* http://www.icao.int/sustainability/Documents/PrivatizedAir lines.pdf.

airlines worldwide,[10] we believe that Congress contemplated that the sale of tickets by travel agents within the United States for passage on foreign-sovereign owned common carriers would constitute "commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2).

Adopting the OBB position would mean that scores of state-owned railroads and airlines worldwide could sell their tickets for foreign travel through travel agents in the United States and then claim sovereign immunity thereafter because the travel agents selling their tickets do not meet the definition of a state instrumentality under § 1603(b). Such

---

[10] We observe the existence of these foreign-state owned railways and airlines as legislative, rather than adjudicative, facts because of their relevance to our "legal reasoning" and interpretation of the "lawmaking process." Fed. R. Evid. 201(a), advisory note to 1972 amendments; *see also* Kenneth Culp Davis, *Judicial Notice*, 55 Colum. L. Rev. 945, 952 (1955) (explaining that a court may "resort to legislative facts, whether or not those facts have been developed on the record"). Even if we were to view the existence of state-owned railroads and airlines as adjudicative facts, it would still be correct to recognize their existence as a matter of judicial notice. We may take judicial notice of an adjudicative fact "that is not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). There might be dispute about whether any particular airline or railroad is state owned. Ownership may have changed; government carriers may have been privatized. There might also be a problem of where to draw the line on percentage of ownership required for the presumption of immunity. But whatever the detail as to particular carriers, it cannot reasonably be disputed that there are many national airlines and railroads worldwide that may market and sell tickets through agents or subagents in the United States. The existence of a state-owned carrier can be shown by reference to government websites and papers of the governments and reviewing agencies.

immunity would extend not only to torts but to contract liability stemming from the actions of their common law agents in the United States. That result would mean that American citizens who buy tickets through authorized domestic agents on airlines or railroads owned by foreign governmental entities could find their reservations not honored and their payments retained. The only recourse against the contract-breaching carrier would be to sue abroad, even though the contract was entered into in the United States. There is no reason to think Congress intended such a chaotic result.

We likewise find no support for OBB's suggested interpretation in the FSIA's legislative history. OBB contends that the legislative history confirms its interpretation because it says that the term "foreign state" applies consistently throughout the FSIA. According to OBB, because the term "foreign state" has a consistent definition throughout the statute,[11] "the definition of an 'agency' in Subsection 1603(b) limits who is an agent for purposes of Section 1605(a)(2)." We do not see the connection. That Congress intended the terms defined in § 1603 to apply consistently throughout the FSIA does not mean that Congress intended for those defined terms to displace principles of common law. Indeed, the Supreme Court has looked to common-law corporate principles to determine the proper interpretation of § 1603(b). *See Dole Food Co.*, 538 U.S. at 474 (relying on a "basic tenet of American corporate law" to hold that "only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement" under § 1603(b)); *see also Samantar*, 560 U.S.

---

[11] Section 1608 employs a different definition of "foreign state." *See* 28 U.S.C. § 1603(a).

at 320 (examining "relevant common law and international practice" to interpret the FSIA).[12]

Moreover, none of the cases relied on by OBB applied this strained reading of the FSIA. The main case on which OBB relies is the Supreme Court's decision in *Samantar*, which held that individual officials are not included within the meaning of "agency or instrumentality of a foreign state." 560 U.S. at 316. OBB points to a passage in the opinion that states that § 1603(b) "specifically delimits what counts as an 'agency or instrumentality.'" *Id.* at 314 (quoting 28 U.S.C. § 1603(b)). That is true, but *Samantar* makes this statement while interpreting what or who constitutes a foreign state under the meaning of § 1603(b). *Id.* at 314–16. That is the opposite question from the one we are presented with here. The other cases cited by OBB are equally unavailing and either do not address the issue or support a statutory

---

[12] In addition to asking us first to adopt what we think is a strained reading of the statute, OBB asks us next to preserve the *Bancec* presumption of separate juridical status to be applied after we determine agency under § 1603(b). That is, OBB argues that the definition of "agency" under § 1603(b) did not fully abrogate common-law principles of agency but preserved the common law as a second requirement for establishing agency. Under that analysis, we would first determine whether an entity met the elements enumerated in § 1603(b) and, if so, we would determine whether that entity met *Bancec*'s standard for overcoming the presumption of separate juridical status.

This analytical framework is untenable. We know of no principle of statutory construction, and OBB cites to none, that supports reading a statute to create a hierarchical system that first requires application of a statutory definition and then allows consideration of the common-law definition for the same term. It seems that OBB would like to construct a gantlet through which no claimant could run, a barrier no claimant could surmount. The plain language of the FSIA does not support such a framework, as explained above.

construction contrary to that proposed by OBB. *See, e.g.*, *Gates*, 54 F.3d at 1460 n.1 (distinguishing the analysis for determining whether a defendant is an agent or instrumentality of a foreign state from the analysis for determining whether to impute the acts of an agency to the government). OBB has not convinced us that its reading of the FSIA is proper.[13] We conclude that RPE's sale of the Eurail pass in the United States can be imputed to OBB.

---

[13] The dissent of Judge O'Scannlain cites the "Presumption of Consistent Usage" canon, which stands for the proposition that a "word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012). In the statute, there are different phrasings of "agency or instrumentality of a foreign state", 28 U.S.C. § 1603(b), and "agent of that foreign state . . . acting within the scope of his or her . . . agency," *id.* § 1605A(c), and the commercial-activity exception, *id.* § 1605(a)(2), which does not include the word "agency." We do not have text from one part of the statute interpreted differently from the same text in another part of the statute. While not applying correctly the maxim of consistent usage, the dissent of Judge O'Scannlain also ignores other statutory construction principles pointing in the direction that an "agent" for purposes of satisfying the commercial-activity exception is not the same as an "agency or instrumentality of a foreign state" for purposes of invoking sovereign immunity. Some of these other principles are: the surplusage canon ("every word and every provision is to be given effect"), the harmonious reading canon ("the provisions of a text should be interpreted in a way that renders them compatible, not contradictory"), the associated words canon ("associated words bear on one another's meaning (*noscitur a sociis*)"), and the prior construction canon ("If a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort . . . they are to be understood according to that construction"). *See* SCALIA & GARNER, 174, 181, 195, 322. All of these canons suggest that "agency or instrumentality of a foreign state" must be interpreted as an entire phrase, and that the definitions within § 1603(b) do not supplant or implicate the common law definition of agency which can be taken into account in assessing § 1605(a)(2).

**2**

Although imputing the sale of the pass by RPE to OBB is essential to showing that the "commercial activity was carried on in the United States," we must still determine if that sale creates "substantial contact" with the United States. 28 U.S.C. § 1603(e). We conclude that it does.

"Substantial contact" is not clearly defined in the FSIA or by our circuit or our sister circuits. *See Shapiro v. Republic of Bol.*, 930 F.2d 1013, 1019 (2d Cir. 1991). It is generally agreed that it sets a higher standard for contact than the minimum contacts standard for due process. *See id.; Mar. Int'l Nominees Establishment*, 693 F.2d at 1109 (explaining that the substantial contact requirement makes "clear that the immunity determination under the first clause diverges from the 'minimum contacts' due process inquiry"). Under this standard, we have concluded that merely executing contracts for the sale of crude oil in the United States, by itself, is not a substantial contact. *Terenkian*, 694 F.3d at 1137. In *Terenkian*, we found relevant that no activity related to the formation of the contracts other than that their execution occurred within the United States. *Id*. at 1126, 1137. In a different context, we have concluded that there was substantial contact where a foreign state, through its agent in the United States, advertised to and solicited customers in the United States, causing numerous Americans to stay in the foreign state's hotel. *Siderman de Blake*, 965 F.2d at 709. Although in some situations the formation of a contract within the United States may not be sufficient to establish substantial contact, in other situations the advertisement to and solicitation of customers in the United States is enough. The context of the commercial activity helps to determine whether the substantial-contact requirement is met.

In the common-carrier context, we also look to factors such as the marketing, selling, and arranging of foreign travel in the United States to determine whether substantial contact exists. *See Schoenberg*, 930 F.2d at 781–82 (concluding that substantial contact exists where the trip was arranged and started in California); *see also Santos v. Compagnie Nationale Air Fr.*, 934 F.2d 890, 894 (7th Cir. 1991) (cataloguing cases); *Sugarman v. Aeromexico, Inc.*, 626 F.2d 270, 272–73 (3d Cir. 1980). Where a ticket for travel on a foreign common carrier is bought and paid for in the United States, we conclude that the substantial contact requirement is satisfied. *See Barkanic*, 822 F.2d at 14. The sale and marketing of Eurail passes within the United States is sufficient to meet the substantial-contact element and to show that OBB carried on commercial activity in the United States. It remains for us to determine whether the claims of Sachs are "based upon" this commercial activity.

## B

"[T]he phrase 'based upon' in § 1605(a)(2) 'is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under [his or her] theory of the case.'" *Lasheen*, 603 F.3d at 1170–71 (quoting *Nelson*, 507 U.S. at 357); *see also Santos*, 934 F.2d at 893 ("An action is based upon the elements that prove the claim, no more and no less."). The "based upon" language demands "more than a mere connection with, or relation to, commercial activity." *Nelson*, 507 U.S. at 358. But it is not necessary that the entire claim be based upon the commercial activity of OBB. Sachs's claims will be "based upon" the commercial activity if "*an element* of [her] claim consists in conduct that occurred in commercial activity carried on in the United States." *Sun*, 201 F.3d at 1109 (quoting *Sugimoto v.*

*Exportadora De Sal*, 19 F.3d 1309, 1311 (9th Cir. 1994)); *see also Terenkian*, 694 F.3d at 1132.

To establish that her action is "based upon" OBB's commercial activity, Sachs must show a nexus between her claims and the sale of the Eurail pass. *See Sun*, 201 F.3d at 1109. We look to Sachs's theory of the case to determine if she meets this burden. *See id*. at 1110; *see also Nelson*, 507 U.S. at 357 (considering Nelson's theory of the case to determine jurisdiction). Sachs's complaint asserts five claims for relief: negligence; strict liability for a design defect; strict liability for failure to warn for a design defect; breach of implied warranty of merchantability; and breach of implied warranty of fitness. "A court must analyze each claim and determine if it is 'based upon' commercial activity . . . ." *Lasheen*, 603 F.3d at 1172. We begin with Sachs's negligence claim.

To show negligence, Sachs must establish that OBB owed her a duty of care. Under Sachs's theory of the case, OBB owed her a duty of care because her purchase of the Eurail pass established a common-carrier/passenger relationship. It is well established that common carriers owe a duty of utmost care to their passengers. *See Andrews v. United Airlines, Inc.*, 24 F.3d 39, 40 (9th Cir. 1994) (applying California law);[14] *see*

---

[14] Some courts have said that "as a general matter, state substantive law is controlling in FSIA cases." *E.g.*, *Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China*, 923 F.2d 957, 959 (2d Cir. 1991) (citing *Bancec*, 462 U.S. at 622 n.11). The Supreme Court in *Bancec* stated in pertinent part: "Section 1606 provides that '[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity . . ., the foreign state shall be liable in the same manner and to the same extent as a private individual in like circumstances.' Thus, where state law provides a rule of liability governing private individuals,

*also* Restatement (Third) of Torts § 40(b) (2012) ("Special relationships giving rise to the duty [of reasonable care] . . . include a common carrier with its passengers."). And the basis for that duty of care is established when a foreign state or its agent sells a ticket or otherwise makes travel arrangements for passage abroad. *See Santos*, 934 F.2d at 893–94.

Here, buying the Eurail pass from RPE was the start of Sachs's tragic misadventure, and buying the pass in the United States helped to define the scope of duty owed by common carrier OBB to the pass purchaser and traveler,

---

the FSIA requires the application of that rule to foreign states in like circumstances." *Bancec*, 462 U.S. at 622 n.11 (quoting 28 U.S.C. § 1606). So we think it is a permissible view of Supreme Court precedent to look to California law to determine the elements of Sachs's claims.

However, it may also be permissible to view the above cases as suggesting there be a choice-of-law decision, either based on the forum's choice of law principles, or some other rule. We have held that, with no choice-of-law provision expressed in the FSIA, we should use the choice-of-law principles of the federal common law, which leads us to the Second Restatement of Conflicts. *See Schoenberg*, 930 F.2d at 782. The Second Restatement factors for the "more significant relationship" test include: the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states; the protection of justified expectations; the policies underlying a field of law; ideas on certainty, predictability, and uniformity of result; and ease in determination and application of applicable law. *Id.* at 783; *see* Restatement (Second) of Conflicts § 6(2) (1971). Even if we should make a separate conflicts analysis under the Restatement, that conflicts analysis supports the same conclusion that California law applies to Sachs's claims. Although Sachs was injured in Austria, the purchase of the common carrier ticket occurred in California. California has a strong interest in providing compensation to its residents under its law when those residents buy a common carrier ticket in California and then travel abroad on state-owned transportation.

Sachs. Because the sale of the Eurail pass is an essential fact that Sachs must prove to establish her passenger-carrier relationship with OBB, a nexus exists between an element of Sachs's negligence claim and the commercial activity in the United States. *See Kirkham*, 429 F.3d at 292 ("[S]o long as the alleged commercial activity establishes a fact without which the plaintiff will lose, the commercial activity exception applies . . . ."). Without the pass, Sachs could not have boarded, or tried to board, the OBB train in Innsbruck. Moreover, the Eurail pass created an exclusive relationship between OBB and Sachs. No one could use this pass but Sachs. The Eurail pass bore her name, said that it was non-transferrable, and required that she present a valid passport to use it. Thus, the sale of the Eurail pass in the United States is "necessary to the 'duty of care' element of [Sachs's] negligence claim." *Id*. To demand more at the jurisdictional phase is to require a plaintiff to prove the merits of her claim, "expanding the category of jurisdictional facts to include actions and events other than the actual commercial activity which triggers the exception." *Id*. at 293.

Sachs's purchase of the couchette reservation upgrade in Innsbruck does not change our conclusion. The passenger-carrier relationship had already been established, and the couchette purchase did not change this relationship or OBB's duty in any way; it rather upgraded the means of her transit in Austria. OBB acknowledges that Sachs could have boarded the train from Innsbruck to Prague with just her Eurail pass, so the couchette reservation merely constitutes an upgrade to her existing pass, not a new transaction. The situation is similar to a person who buys a coach-class airline ticket but pays an additional fee for a first-class upgrade before boarding the plane. The latter is not a new transaction that changes the duty of care owed by the airline to the passenger.

Similarly, Sachs's purchase of the upgrade changed nothing about the duty of care OBB owed her. Because the sale of the Eurail pass in the United States forms the basis of an element of Sachs's negligence claim, she satisfies the "based upon" requirement for that claim.

OBB contends that this conclusion is inconsistent with our decision in *Sun v. Taiwan*. We disagree. In *Sun*, we considered whether the appellants could bring a wrongful death action against Taiwan under the commercial-activity exception after their son drowned during a cultural tour of Taiwan. 201 F.3d at 1106. The Suns alleged that Taiwan was negligent by failing to warn their son of the swimming hazards and failing to exercise reasonable supervision. *Id.* at 1109. We concluded that Taiwan had engaged in commercial activity in the United States by promoting and managing applications for the program, but that this activity did not form the basis of Sun's negligence claims. *Id*. at 1110. We explained that "[t]he promotion and application process in the United States was not conduct involved in proving any of the elements of the Suns' action." *Id*.[15] Sachs's negligence claim is different from that considered in *Sun* because OBB's conduct in the United States—the sale of the Eurail pass—is essential to proving the duty-of-care element of Sachs's negligence claim.

Similarly, our conclusion is consistent with the Supreme Court's decision in *Saudi Arabia v. Nelson*, which analyzed the "based upon" requirement of the commercial-activity exception. The Supreme Court concluded that Nelson's

---

[15] The Suns later claimed that the organization of the trip in the United States established a duty of care, but because that was a new issue on appeal, we did not decide it. *Sun*, 201 F.3d at 1110 & n.2.

action "alleging personal injury resulting from unlawful detention and torture by the Saudi Government [was] not 'based upon a commercial activity' within the meaning of [the FSIA]." *Nelson*, 507 U.S. at 351. To reach this conclusion, the Court rejected Nelson's argument that the defendant's act of recruiting and signing a contract with Nelson in the United States was the relevant commercial activity that formed the basis of Nelson's tort claims. *Id*. at 358. Although those acts within the United States preceded the torts alleged by Nelson, they were not relevant to proving Nelson's claims. *Id*. In contrast, Sachs's negligence claim requires her to show that OBB owed her a duty of care as a passenger on its train—a duty based upon the sale of the Eurail pass within the United States.

For similar reasons, we conclude that Sachs's breach-of-implied-warranty claims and strict-liability claims are "based upon" the sale of the Eurail pass.[16] Products-liability claims and breach-of-implied-warranty claims are variations on a theme: attributing liability based on the sale of a product into the market. *See Greenman v. Yuba Power Prods. Inc.*, 377 P.2d 897, 900–901 (Cal. 1963) (discussing implied warranties and strict liability for design defects); *see also* Dan B. Dobbs et al., *The Law of Torts* § 448 (2d ed. 2011) ("To a large extent, the law of implied warranty gradually merged with strict tort liability."). A transaction between a seller and a consumer is a necessary prerequisite to proving either type of claim. *See* Restatement (Second) of Torts § 402A (1965)

---

[16] We review Sachs's claims only to the extent necessary to determine whether jurisdiction exists under the FSIA. Whether Sachs has properly pleaded these claims is not before us. *See Kirkham*, 429 F.3d at 293 (explaining that the jurisdictional inquiry under the FSIA is distinct from the Rule 12(b)(6) analysis).

(establishing liability for those who sell products to consumers); West's Ann. Cal. Com. Code § 2314(1) ("[A] warranty that the goods shall be merchantable is implied in a contract for their sale. . . ."); West's Ann. Cal. Com. Code § 2315 (establishing an implied warranty that the goods shall be fit for a particular purpose at the time of contracting). Here, the sale relevant to proving these claims is the sale of the Eurail pass to Sachs in the United States.[17]   As we explained above, Sachs's purchase of the couchette upgrade does not change our conclusion because her existing Eurail pass was a necessary precedent to the upgrade.  Because the sale of the Eurail pass in the United States forms an essential element of each of Sachs's claims, we conclude that Sachs's claims are "based upon a commercial activity carried on in the United States" by OBB.[18]   28 U.S.C § 1605(a)(2).

---

[17] The dissent of Judge O'Scannlain does not contest that if the ticket sale of the Eurail pass to Sachs in the United States was commercial activity of OBB, then the negligence claim is based on that conduct in the sense that one of the elements of negligence is the creation of the duty of the common carrier.  But the dissent of Judge O'Scannlain argues that strict liability stands on a different footing because that claim does not require privity of contract.  This misses the point.  Under the standard formulation for strict liability for harm to a consumer, there must be a sale of the product. *See* Restatement (Second) of Torts § 402A (1965).  Here, the sale by RPE was in the United States, and there is jurisdiction on the strict liability claim.

[18] Chief Judge Kozinski, though he joins Judge O'Scannlain's dissenting analysis, launches his own independent theory to take agency out of the case.  Thus, Chief Judge Kozinski's dissent argues that even if the Eurail pass tickets here sold by OBB's agent had been sold directly by Austria "from a kiosk in Times Square," Chief Judge Kozinski Dissent at 53, nonetheless, Sachs's claims would not be based upon commercial activity in the United States.  To reach this conclusion, Chief Judge Kozinski would simply overrule all prior case law in the Ninth Circuit which had held that it was sufficient if an element of the claim was supported by the

# V

We hold that the first clause of the FSIA commercial-

---

domestic commercial activity. Chief Judge Kozinski, in his separate dissent, does not persuasively rebut the reasoning of our precedents holding, or the Supreme Court's prior opinion in *Nelson*, 507 U.S. at 358 n.4, leaving open, that commercial activity in the United States, supporting an element of a claim, was sufficient for jurisdictional purposes.

Further, the cases that Chief Judge Kozinski relies upon do not have the type of nexus to the United States that would be created, using his hypothetical example, by Austria itself selling its Eurail pass tickets from a kiosk in Times Square. *Sosa* concerned a Mexican physician's suit against the United States under the Federal Tort Claims Act, after he was seized by Mexican nationals in Mexico at the behest of the U.S. Drug Enforcement Agency. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 697–98 (2004). *Sosa* did not involve the FSIA. *Kiobel* concerned the alleged complicity of foreign corporations with the Nigerian government for atrocities committed in Nigeria against Nigerian citizens, in violation of international law norms. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1662–63 (2013). *Kiobel* was an Alien Tort Statute case, and did not involve the FSIA. *Morrison* concerned securities transactions that neither occurred in the United States nor involved securities listed on U.S. exchanges. *See Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010). *Morrison* did not involve the FSIA.

Cases like *Sosa*, *Kiobel*, and *Morrison*, while they caution against opening U.S. courts or applying U.S. laws to foreign activities of foreign entities, do not engage with the commercial-activity exception of the FSIA, and do not properly bear on whether that exception can be satisfied by a foreign country selling common carrier tickets through a kiosk in Times Square, Chief Judge Kozinski's hypothetical, or on the practice of foreign sovereign airlines or rail systems selling tickets in the United States through travel agents within the United States. Congress enacted the commercial-activity exception so that foreign sovereigns, if they engaged in commercial activity in the United States, could be called into account in our courts.

activity exception applies to a common carrier owned by a foreign state that acts through a domestic agent to sell tickets to United States citizens or residents for passage on the foreign common carrier's transportation system.  Sachs has met her burden of proving that the first clause of the commercial-activity exception applies.  The district court erred in concluding that it lacked subject-matter jurisdiction over Sachs's claims.  We reverse and remand for further proceedings consistent with this opinion, including consideration of the other claims raised by OBB in its motion to dismiss.[19]

**REVERSED and REMANDED.**

O'SCANNLAIN, Circuit Judge, dissenting, with whom KOZINSKI, Chief Judge, and RAWLINSON, Circuit Judge, join:

Because I am not persuaded that an instrumentality of the Republic of Austria may be subjected to the jurisdiction of the United States Courts on the basis of the facts alleged in this case, I must respectfully dissent from the decision of the en banc court to the contrary.

I

The Foreign Sovereign Immunities Act of 1976 (FSIA) is "the sole basis for obtaining jurisdiction over a foreign state

---

[19] Whether Sachs can successfully pursue her claims depends on a great many issues that are not presently before us.  We express no view on those issues.

in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, a foreign state is presumptively "immune from the jurisdiction of the courts of the United States" unless the plaintiff can show that his action falls within a specified statutory exception. 28 U.S.C. § 1604; *see also Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1127 (9th Cir. 2012).

Exceptions to sovereign immunity must be interpreted narrowly. Courts should guard against overly broad readings because expanding federal jurisdiction in this area can have serious foreign policy consequences. *See Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1155–56 (7th Cir. 2001) ("In interpreting the FSIA, we are mindful that judicial resolution of cases bearing significantly on sensitive foreign policy matters, like the case before us, might have serious foreign policy implications which courts are ill-equipped to anticipate or handle.") (internal quotation marks omitted); *see also* J.H. Trotter, *Narrow Construction of the FSIA Commercial Activity Exception:* Saudi Arabia v. Nelson, 33 Va. J. Int'l L. 717, 733–34 (1993) ("As [the FSIA] exceptions undergo judicial expansion . . . the strains on foreign policy intensify."). Indeed, we have expressly recognized the restricted nature of these exceptions. *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) (describing the FSIA's exceptions as "narrow"); *see also McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012) (describing the FSIA's exceptions as "narrowly drawn").

By expanding the commercial-activity exception to encompass the facts in this case, the court, regrettably, claims jurisdiction that is denied to us by statute.

II

Carol P. Sachs, who lives in California, purchased a Eurail pass online from Rail Pass Experts (RPE), an entity located in Massachusetts. A Eurail pass enabled her to ride railways in Austria and the Czech Republic. RPE gained authority to sell Eurail passes from the Eurail Group. OBB Personenverkehr AG (OBB), a railway wholly owned by the Austrian government, is one of many Eurail Group members. OBB and Eurail are separate entities with distinct managements, employees, and purposes. While in Austria, Sachs attempted to board a moving train operated by OBB. She fell between the platform and the train such that she landed on the tracks, suffering severe bodily injuries. Sachs has sued OBB for negligence, strict liability, and breach of implied warranties.

Our analytical task in this case is made easier by the limited nature of the parties' arguments. Sachs does not contest that OBB is an instrumentality of the Republic of Austria and therefore entitled to foreign sovereign immunity under the FSIA. The majority correctly notes that "[t]he [only] exception relevant to this appeal is the first clause of the commercial-activity provision."[1] Slip Op. at 10. The commercial-activity exception can helpfully be divided into three requirements: (1) the activity must be commercial rather than sovereign, (2) the activity must be "carried on in the

---

[1] "A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). Like the majority, I use the phrase "commercial-activity exception" to refer to the first clause of § 1605(a)(2). *See* Slip Op. at 10 n.3.

United States by the foreign state," and (3) the plaintiff's suit must be "based upon" that activity.  28 U.S.C. § 1605(a)(2).

The parties do not dispute that the only relevant commercial activity in the United States was Sachs' purchase of a Eurail pass from RPE.  *See* Slip Op. at 11 n.4.  OBB does not contest that the sale of the Eurail pass was commercial, rather than sovereign, activity.   The first requirement is therefore satisfied. It is the two other requirements that are disputed.

## III

To repeat, the commercial-activity exception applies only if the activity in question was "carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).[2]  Although the sale of the ticket by RPE clearly occurred in the United States, OBB disputes that *it* "carried on" that activity.  Rather, OBB argues that the sale is attributable exclusively to RPE. *See Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 306 (9th Cir 1997) ("Defendants should be permitted to argue . . . that they did not act: that there was no commercial activity *of the foreign state*.") (internal quotation marks omitted).

To determine whether the activity is attributable to OBB, it is necessary to consider the meaning of "foreign state." Because foreign states are not natural persons, they necessarily act through agents.  *See* Slip Op. at 20.   The question is what principle limits the extent to which another

---

[2] Congress defined "commercial activity carried on in the United States by a foreign state" to mean "commercial activity carried on by such state and having substantial contact with the United States."   28 U.S.C. § 1603(e).

entity's activity can be attributed to a foreign state for purposes of the FSIA.

Relying on *Phaneuf*, the majority rules that the activity of any authorized agent can be imputed to a foreign sovereign. *See* Slip Op. at 17 ("Because we conclude RPE acted as an authorized agent of OBB, we impute RPE's sale of the Eurail pass in the United States to OBB.") (citing *Phaneuf*, 106 F.3d at 307–08).[3]  Thus, it effectively reads "activity carried on . . . by a foreign state" and "activity carried on by such state" to mean activity carried on by the authorized agents of a foreign state.     This necessarily equates a foreign state and its authorized agents.

With respect, I suggest that such a reading is inconsistent with other provisions of the FSIA.  Rather, "foreign state" must be interpreted more narrowly.  The approach we adopted in *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009), correctly interpreted "foreign state" and provides a framework with which to analyze this case.  Under this narrower reading, "activity carried on . . . by a foreign state" cannot include activity carried on by RPE.

---

[3] While *Phaneuf* held that an agent must have acted with actual authority in order for its actions to be attributed to a foreign state, *Phaneuf*, 106 F.3d at 308, it did not hold that actual authority was sufficient to allow for such attribution in all circumstances.  The actions at issue in *Phaneuf* were taken by members of Indonesia's National Defense Security Council, rather than a corporate entity with whom Indonesia had only a loose relationship, so the closeness of the connection between the foreign state and the alleged agent was not at issue.  *See id*. at 304, 307.

A

The term "foreign state," of course, is used repeatedly in the FSIA, not just in the commercial-activity exception. The meaning of "foreign state" remains constant throughout the statute, and textual evidence from other provisions demonstrates that "foreign state" cannot be so broad as to include all authorized agents of a foreign state.

1

Courts generally presume that a term is used consistently throughout a statute. *See Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."); Antonin Scalia & Bryan A. Garner, *Reading Law* 170 (2012) (discussing the presumption of consistent usage).[4]  Here, far from indicating that different uses of "foreign state" have different meanings, the FSIA suggests that the definition remains constant throughout the statute (with the express exception of § 1608, which is not relevant here).  *See* 28 U.S.C. § 1603(a) ("*For purposes of this chapter*—(a) A 'foreign state,' except as used in section

---

[4] The majority misinterprets this analysis as applying the presumption of consistent usage to distinct phrases, "agency or instrumentality of a foreign state" in § 1603(b), "agent of that foreign state [ ] acting within the scope of his or her . . . agency" in § 1605A(c), and the commercial-activity exception in § 1605(a)(2). Slip Op. at 26 n.13.  In reality, I apply the presumption of consistent usage to the term "foreign state," not to each phrase as a whole.  Such application is consistent with *Samantar v. Yousuf*, 560 U.S. 305, 317–18 & n.11 (2010) (interpreting "foreign state" in § 1604 in light of the use of "foreign state" in § 1605A and § 1605(a)(5)).

1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." ) (emphasis added).

Confirming this analysis, the Supreme Court has interpreted the term "foreign state" consistently. In *Samantar v. Yousuf*, 560 U.S. 305 (2010), the Court interpreted "foreign state" as it was used in § 1604, which grants immunity to "foreign state[s]." 28 U.S.C. § 1604. In doing so, the Court expressly relied on the meaning of "foreign state" in an exception to immunity found in § 1605(a)(5). *See Samantar*, 560 U.S. at 317–18. Such approach is sensible only if "foreign state" has the same meaning in both provisions. Clearly, Supreme Court precedent indicates that "foreign state" has the same meaning when providing an exception to immunity as it does when granting immunity.

The majority, by contrast, treats the meaning of "foreign state" for the purposes of § 1604 and the meaning of "foreign state" for the purposes of § 1605 as separate inquiries. *See* Slip Op. at 20 (contrasting the status required to claim sovereign immunity and the status required for activity to be attributable under the commercial-activity exception). In light of the presumption of consistent usage and Supreme Court precedent applying it to the FSIA, I cannot accept the majority's assumption that the interpretation of this term differs so greatly between provisions.

2

Given that the meaning of "foreign state" is consistent, we can turn to analyzing the meaning of that term in other provisions of the FSIA. Textual evidence from § 1605A,

which also uses "foreign state," indicates that the term does not embrace all authorized agents.

Section 1605A(c) creates a cause of action against "[a] foreign state that is or was a state sponsor of terrorism . . . and any official, employee, or *agent of that foreign state while acting within the scope of his or her office, employment, or agency*." 28 U.S.C. § 1605A(c) (emphasis added). In *Samantar*, the Supreme Court tells us that "the creation of a cause of action against both the 'foreign state' and 'any official, employee, or agent' thereof reinforces the idea that 'foreign state' does not by definition include foreign officials." *Samantar*, 560 U.S. at 318 n.11 (citation omitted). Relying on § 1605A(c) and a similar provision in § 1605(a)(5), the Court invoked the rule against superfluity: "If the term 'foreign state' by definition includes an individual acting within the scope of his office, the phrase 'or of any official or employee . . .' in 28 U.S.C. § 1605(a)(5) would be unnecessary." *Id*. at 318 (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476–77 (2003) ("[W]e should not construe the statute in a manner that is strained and, at the same time, would render a statutory term superfluous.")).

Just as the inclusion of "official" in § 1605(a)(5) and § 1605A(c) would be superfluous were "foreign state" to include officials, the inclusion of "agent" in § 1605A(a)[5] and

---

[5] Section 1605A(a) uses similar language to create a specific exception to immunity for:

> any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by [specified acts] if such act . . . is engaged in by *an official, employee, or agent* of such foreign state while acting

§ 1605A(c) would be superfluous if "foreign state" included all agents acting in the scope of their agencies (that is, authorized agents). And just as the avoidance of superfluity in another provision informed *Samantar*'s interpretation of "foreign state" in § 1604, it similarly affects the meaning of "foreign state" in § 1605(a)(2). Therefore, by the same logic that the Supreme Court used in *Samantar*, the commercial-activity exception's use of "foreign state" does not include all authorized agents.

B

Because the majority's approach is inconsistent with the text of the statute, another approach is required. Our opinion in *Holy See* provides the proper standard for attributing the actions of third parties to foreign states. In determining whether acts taken by the Archdiocese of Portland, the Catholic Bishop of Chicago, and the Order of the Friar Servants could be imputed to the Holy See for determining jurisdiction under the FSIA, the *Holy See* court relied on *First National City Bank v. Banco Para el Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611 (1983). *Bancec* created a presumption of separate status for liability purposes. *Id.* at 626–27. This presumption could be overcome "in two instances: when 'a corporate entity is so extensively controlled by its owner that a relationship of principal and

---

within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1) (emphasis added).

agent is created,'[6] or when recognizing the separate status of a corporation 'would work fraud or injustice.'" *Holy See*, 557 F.3d at 1077–78 (quoting *Bancec*, 462 U.S. at 629).

While *Bancec* dealt with questions of substantive liability rather than jurisdiction, *Holy See* decided that the standard announced in *Bancec* applied to jurisdictional questions as well. *See Holy See*, 557 F.3d at 1079. Thus, a determination of whether to attribute the actions of another entity to a foreign state for jurisdictional purposes begins with a presumption against such attribution. That presumption can be rebutted if the other entity is the alter ego of the foreign state or if failure to attribute the entity's actions to the foreign state "would work fraud or injustice." *Id*. at 1077–78. Other circuits have applied *Bancec* to jurisdictional issues as well. *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992).

The standard from *Holy See* fits the statutory text well. *Holy See* counsels in favor of reading "activity . . . by a foreign state" to mean activity by a foreign state, its alter ego, or an entity the recognition of whose separateness would

---

**[6]** As will be discussed below, the Court used the term "agent" in a different sense than the majority does. Courts have interpreted this prong of the *Bancec* standard to refer to an "alter ego" analysis. *See, e.g., Holy See*, 557 F.3d at 1080 (comparing the *Bancec* standard to an "'alter ego' or 'piercing the corporate veil'" standard); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) (noting that "in the case cited by the Supreme Court to illustrate the agency exception, various corporations were allegedly operated as a 'single enterprise.'").

work fraud or injustice.[7]    Incorporation of the *Bancec*
standard has the considerable benefits of not rendering any
statutory terms superfluous and being capable of consistent
application throughout the FSIA.    An interpretation of
"foreign state" that includes a foreign state's alter ego would
not make any words in § 1605A superfluous. *See supra* Part
III.A.2.

    The majority purports to distinguish *Holy See* on the
ground that *Bancec* and *Holy See*, unlike this case, arose in
the context "of corporate affiliates."    Slip Op. at 18
(distinguishing "a corporate relationship" from "principles of
agency").  Even assuming the validity of this distinction, the
majority draws the wrong conclusion.  That *Holy See* applies
a stringent alter ego test to the activity of corporate affiliates
does not suggest that we should apply a more lenient
authorized agent standard to the activity of non-affiliate
entities.  If anything, the lack of an affiliate relationship
supports application of a more stringent test because a
corporate affiliate is more likely to have a close and
substantial relationship with its foreign state than another
entity is.  That is borne out in this case: OBB may not have
even been aware that RPE existed before this lawsuit.  Thus,
the majority's "authorized agent" standard creates an
anomaly in our case law because it retains the *Holy See*
standard for affiliates but creates a much looser test for non-
affiliate entities that will often have fewer ties to the foreign
state.

---

    [7] How (or whether) this standard would apply to the actions of an
individual agent, rather than entity agent, need not be addressed in this
case.  RPE is an entity, not an individual.

But the majority's distinction between the corporate affiliate context and the agency context is problematic for another reason as well: courts applying the *Bancec* standard have spoken expressly in terms of agency.  In *Bancec* itself, the Court described the alter ego analysis as relevant because such extensive control creates "a relationship of principal and agent."  *Bancec*, 462 U.S. at 629; *see also Holy See*, 557 F.3d at 1079 ("[I]n applying the jurisdictional provisions of the FSIA, courts will routinely have to decide whether a particular individual or corporation is an agent of a foreign state.").  Thus, at least in certain circumstances, we have held that the *Bancec* standard is the method for determining whether another entity is an agent of a foreign state.  The majority, therefore, cannot distinguish *Holy See* on the ground that it applies to the actions of corporate affiliates rather than agents.

Of particular importance here is that the meaning of "agent" or "agency" varies in different legal contexts.  *See Holy See*, 557 F.3d at 1080 ("'Agent' can have more than one legal meaning.").  In *Holy See*, the court contrasted the typical common law agency analysis with the first prong of the *Bancec* standard.  *See id.* ("The *Bancec* standard is in fact most similar to the 'alter ego' or 'piercing the corporate veil' standards . . .").

The plaintiff in *Holy See* alleged a traditional agency relationship as the basis for attributing the actions of others to the Holy See.  *See id.* ("Doe does directly allege in his complaint that the corporations are 'agents' of the Holy See."); Pl.-Appellee/Cross-Appellant John V. Doe's Principal and Resp. Br., 2007 WL 923313, II.C.1 ("Appellants Catholic Bishop, Archdiocese and Order, were the agents of Appellant Holy See, acting in furtherance of the purposes of the the [sic]

Holy See, doing the kind of acts they were engaged to perform, and were motivated, at least in part, to further the purposes of the Holy See."). Nonetheless, the *Holy See* court ruled that it could not "infer from the use of the word 'agent' that Doe [wa]s alleging the type of day-to-day control that *Bancec* . . . require[s] to overcome the presumption of separate juridical status." *Holy See*, 557 F.3d at 1080. If a common law agency relationship were all that is required for the imputation of an agent's actions to the foreign state, surely the court would have treated Doe's allegation differently in *Holy See*. Thus, it is clear that the sort of agency relationship that *Bancec* and *Holy See* required for the imputation of actions to the foreign state (an alter ego relationship, for example) differs significantly from the all-authorized-agents standard adopted by the majority.

## C

Sachs simply cannot show that RPE's actions are attributable to OBB under the *Bancec* standard. The first method of rebutting the presumption of separateness, the alter ego analysis, certainly cannot apply on these facts. Far from being the alter ego of OBB, RPE and Eurail are independent companies with different managements from OBB. RPE may be a subagent of Eurail, but Eurail is controlled by a group of railways, not OBB alone. The second method of rebutting the presumption of separateness—whether recognizing separate existences would work fraud or injustice—certainly does not suggest that the actions of RPE should be attributed to OBB. In *Bancec*, the Court found such equitable prong applicable because Bancec was attempting to recover money that would directly benefit the Cuban government while simultaneously arguing that its claim should not be subject to a set-off that would have applied if the Cuban government sued directly.

*Bancec*, 462 U.S. at 631–32. Here, OBB has not behaved in a comparable way. OBB has not, for example, inconsistently characterized RPE's actions to its advantage; it has consistently asserted that RPE's actions cannot be attributed to it.

If there is any "injustice" at all from failing to impute RPE's actions to OBB, it stems from Sachs' inability to sue OBB in American courts. This, however, is not the sort of injustice that validates treating RPE as if it were OBB. The inability to sue in American courts is a natural result of recognizing foreign sovereign immunity, the general rule and policy of the FSIA. *See Sachs v. Republic of Austria*, 695 F.3d 1021, 1026 (9th Cir. 2012) ("Any injustice that results is no greater than the mine-run of cases—jurisdiction over a foreign state is, after all, ordinarily not available.").

## D

The majority relies on *Barkanic v. General Administration of Civil Aviation of the People's Republic of China*, 822 F.2d 11 (2d Cir. 1987), and *Kirkham v. Societe Air France*, 429 F.3d 288 (D.C. Cir. 2005). These cases do not analyze when the acts of agents can be attributed to a foreign state. As acknowledged by the majority, *see* Slip Op. at 14 n.5a, the parties in *Barkanic* and *Kirkham* did not dispute that the relevant actions constituted activity of the foreign state. *See Barkanic*, 822 F.2d at 13 (assuming without discussion that a ticket sale by Pan American was attributable to the defendant); *Kirkham*, 429 F.3d at 291–92 (noting that the "sole question" before the court related to the "based upon" prong of the commercial-activity exception). Although those courts "had an independent duty to assess jurisdiction," *see* Slip Op. at 14 n.5b, their decisions "do[ ]

not stand for the proposition that no defect existed." *Arizona Christian School Tuition Organization v. Winn*, 131 S. Ct. 1436, 1448 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed.").

The majority makes much of the possibility that, if its reading were rejected, federal courts would not be able to exercise jurisdiction over foreign states based on the actions of travel agents. Slip Op. at 21–24. The majority's concern seems to stem from the idea that the lack of federal jurisdiction would leave plaintiffs to sue abroad, a result the majority describes as too "chaotic" for Congress to have intended. Slip Op. at 24. But, the general rule for the FSIA is that foreign states are immune from suit; there will be many instances in which Americans who wish to sue foreign sovereigns can only do so overseas. This is a result Congress clearly intended in many instances, so it is hard to see why the same result in this situation should strike the majority as so "chaotic."

Because Sachs has not shown that RPE and OBB have a relationship that rebuts the *Bancec* presumption of separate status, I would affirm the district court's dismissal for lack of jurisdiction.

IV

Even if the sale of the Eurail pass by RPE were "commercial activity carried on . . . by the foreign state," sovereign immunity would still, at a minimum, bar Sachs' strict liability claims because they are not "based upon" the sale of the pass, as would be required for the commercial-activity exception to apply. 28 U.S.C. § 1605(a)(2).

Assuming the majority's interpretation of this requirement is correct, I agree that Sachs' negligence and implied warranty claims would be "based upon" the sale of the Eurail pass had the sale been attributable to OBB. The Supreme Court has clarified that the commercial activity in question, here the sale of the Eurail pass, must be an "element[ ] of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). The majority understands this to mean that a claim is based upon commercial activity if that activity will establish *one* element of the claim. But still, a mere connection between the claim and the commercial activity is insufficient. *Sun v. Taiwan*, 201 F.3d 1105, 1110 (9th Cir. 2000) (citing *Nelson*, 507 U.S. at 362).

The majority believes that Sachs' negligence claim is "based upon" the sale of the Eurail pass because the sale evidences that OBB, as a common carrier, owed a duty of care to Sachs, a passenger. Slip Op. at 29–31. This strikes me as a proper application of the majority's rule; however, the majority also concludes that Sachs' other claims are "based upon" the sale of the Eurail pass because the sale was the transaction necessary for an implied warranty claim or strict liability claim. Slip Op. at 33.

This theory inappropriately lumps together Sachs' strict liability claims and implied warranty claims. While the majority is correct that both types of claims center on "attributing liability based on the sale of a product into the market," Slip Op. at 33, there is a crucial difference between them. Strict liability claims do not require proof that the plaintiff entered a transaction with the defendant. *Greenman v. Yuba Power Products, Inc.*, 377 P.2d 897 (Cal. 1963), which the majority relies on to explain California law on

strict liability, discusses "the abandonment of the requirement of a contract between" the manufacturer and the plaintiff. *Id*. at 901; *see also* Restatement (Third) of Torts: Products Liability § 1 cmt a (1998) ("Strict liability in tort for defectively manufactured products merges the concept of implied warranty, in which negligence is not required, with the tort concept of negligence, in which contractual privity is not required.").

While the majority claims that Sachs' strict liability claim requires her to prove that OBB was a "seller," Slip Op. at 33, California cases suggest that a strict liability plaintiff need not prove that the defendant is a seller. *See Price v. Shell Oil Co.*, 466 P.2d 722, 726 (Cal. 1970) ("[W]e can perceive no substantial difference between *sellers* of personal property and *non-sellers*, such as bailors and lessors. In each instance, the seller or non-seller places [an article] on the market, knowing that it is to be used without inspection for defects.") (second alteration in original) (internal quotation marks omitted); *Greenman*, 377 P.2d at 901 ("To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use.") Under California law, it appears that OBB's provision of train service and Sachs' use of it are sufficient to subject OBB to strict liability. Therefore, Sachs has not established that she must prove that OBB was a "seller" in order to prevail on her strict liability claim.

Because contractual privity is not an element of Sachs' strict liability claims, they are not "based upon" the sale by RPE, the only relevant commercial activity. Sachs, therefore,

may not invoke the commercial-activity exception to overcome OBB's sovereign immunity. Even if RPE's sale of the Eurail pass to Sachs were attributable to OBB, the majority should affirm the district court insofar as it dismissed the strict liability claims for lack of jurisdiction.

V

For the foregoing reasons, I would affirm the district court's dismissal for lack of jurisdiction. Because RPE's sale of the Eurail pass is not attributable to OBB, Sachs has not alleged commercial activity "by the foreign state." Indeed, even if the majority's theory of attribution were valid, the strict liability claims would still need to be dismissed because they are not "based upon" the sale to Sachs in the United States.

Chief Judge KOZINSKI, dissenting:

I agree with Judge O'Scannlain that a foreign sovereign doesn't engage in commercial activity in the United States when a subagent over which it exercises no direct control sells tickets for passage on a common carrier wholly owned by that sovereign. But there is another, simpler way to affirm the district court. Because plaintiff's claim arises from events that transpired entirely in Austria, it isn't "based upon" commercial activity carried on in the United States. 28 U.S.C. § 1605(a)(2). This would be true even if Austria were itself selling train tickets from a kiosk in Times Square.

The majority holds that all of plaintiff's claims are based on domestic commercial activity, relying on our cases

requiring that only "'*an element*'" of the claim consist of such activity. Maj. op. at 28 (quoting *Sun* v. *Taiwan*, 201 F.3d 1105, 1109 (9th Cir. 2000)). But an en banc court can overrule circuit law; in fact, that's the principal reason for taking a case en banc. *See Atonio* v. *Wards Cove Packing Co.*, 810 F.2d 1477, 1479 (9th Cir. 1987) (en banc). Because these earlier cases conflict with Supreme Court precedent, we should take the opportunity to sweep them aside.

The Supreme Court has addressed what it means for a claim to be "based upon" commercial activity only once. In *Saudi Arabia* v. *Nelson*, 507 U.S. 349 (1993), the Court observed that "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* at 357. *Nelson* emphasized the limited scope of its holding: "We do not mean to suggest that the first clause of § 1605(a)(2) necessarily requires that each and every element of a claim be commercial activity by a foreign state, and we do not address the case where a claim consists of both commercial and sovereign elements." *Id.* at 358 n.4. Some of our cases have misread this holding—that a claim *can* be based upon commercial activity even if proving that activity won't establish *every* element of the claim—for an endorsement of the converse proposition—that a claim *is* based upon commercial activity so long as proving that activity will establish at least *one* element of the claim. *See, e.g.*, *Sun*, 201 F.3d at 1109; *Sugimoto* v. *Exportadora de Sal, S.A. de C.V.*, 19 F.3d 1309, 1311 (9th Cir. 1994).

This broad interpretation of the "based upon" requirement runs contrary to our "background rule that foreign states are immune from suit," subject only to "narrow exceptions." *Peterson* v. *Islamic Republic of Iran*, 627 F.3d 1117, 1125

(9th Cir. 2010). It also invites plaintiffs' lawyers to manufacture jurisdiction through artful pleading.

An action can frequently be brought under multiple theories, as plaintiff's negligence, breach-of-contract and product-liability claims amply demonstrate. Each of these theories accords plaintiffs plenty of opportunity to find at least one element involving domestic commercial conduct. For example, the Supreme Court observed in *Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004), that "'[i]t will virtually always be possible to assert that the negligent activity that injured the plaintiff [abroad] was the consequence of faulty training, selection or supervision . . . in the United States.'" *Id.* at 702 (second alteration in original) (quoting *Beattie* v. *United States*, 756 F.2d 91, 119 (D.C. Cir. 1984) (Scalia, J., dissenting)). *Sosa* considered a claim under the Federal Tort Claims Act (FTCA) arising out of plaintiff's abduction in Mexico. Although the Court recognized that negligent acts or omissions during the planning stages in the United States may have contributed to the injury, this was not sufficient to overcome the FTCA's exclusion of "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k).

This mode of analysis applies with even greater force when we are dealing with suits against foreign sovereigns. Earlier this year, the Supreme Court cited "the danger of unwarranted judicial interference in the conduct of foreign policy" in holding that the Alien Tort Statute did not automatically apply to violations of the law of nations that occur within the territory of a foreign sovereign. *Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013). Similarly, in *Morrison* v. *Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), the Court interpreted Section 10(b) of the Securities Exchange Act of 1934 as inapplicable to

transactions that neither occurred in the United States nor involved securities listed on U.S. exchanges. *Id.* at 2886. Although the government argued that the term "in connection with the purchase or sale of any security registered on a national securities exchange" should be read more broadly, the Court reasoned that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* at 2884 (emphasis in original).

The *Nelson* Court recognized the perils of an overly permissive reading of the FSIA's "based upon" requirement when it rejected plaintiff's failure-to-warn claim as a "semantic ploy" designed to dress up what was, at its heart, an intentional tort claim based on conduct that occurred exclusively in Saudi Arabia. *Nelson*, 507 U.S. at 363. It didn't dispute that the commercial activity would prove one element of a failure-to-warn claim, but recognized that "[t]o give jurisdictional significance to this feint of language would effectively thwart the Act's manifest purpose to codify the restrictive theory of foreign sovereign immunity." *Id.*

Our case illustrates the expansive sweep of the majority's approach. Plaintiff had a train ticket to travel from Austria to the Czech Republic. She was injured due to defendant's alleged negligence when she tried to board. The injury and any negligence occurred in Austria. But, because plaintiff happened to buy her ticket online from a vendor in Massachusetts, a federal court in California now asserts power to hale the Austrian government before it and make it defend against a claim based on facts that occurred in Austria.

This makes as much sense as forcing Mrs. Palsgraf to litigate her case in Vienna.

As the *Sosa* Court recognized with respect to the FTCA, a critical element in this analysis is proximate causation, with jurisdiction hinging on whether "the act or omission [in the United States] was sufficiently close to the ultimate injury, and sufficiently important in producing it, to make it reasonable to follow liability back to the [domestic] behavior." *Sosa*, 542 U.S. at 703. "[U]nderstanding that California planning was a legal cause of the harm in no way eliminates the conclusion that the claim here arose from harm proximately caused by acts" abroad. *Id.* at 704. Because plaintiff hasn't shown a sufficient nexus between her purchase and the injury, we have no jurisdiction over Austria. I would affirm the district court on that basis. *See Weiser* v. *United States*, 959 F.2d 146, 147 (9th Cir. 1992) ("Our review is not limited to a consideration of the grounds upon which the district court decided the issues; we can affirm the district court on any grounds supported by the record.").